**Exhibit 6E – Craighead 2002 Appeal Brief**

## STATE OF MICHIGAN

## IN THE COURT OF APPEALS

**PEOPLE OF THE STATE OF MICHIGAN**

              Plaintiff-Appellee,

-vs-

**MARK TALBORT CRAIGHEAD**

              Defendant-Appellant.

_____/

**WAYNE COUNTY PROSECUTOR**
Attorney for Plaintiff-Appellee

_____

**VALERIE R. NEWMAN (P47291)**
Attorney for Defendant-Appellant

_____

**Court of Appeals No.** 243856

**Lower Court No.** 00-7900-01

## APPELLANT'S BRIEF ON APPEAL
## (ORAL ARGUMENT REQUESTED)

**STATE APPELLATE DEFENDER OFFICE**

**BY:**    **VALERIE R. NEWMAN (P47291)**
           **Assistant Defender**
           3300 Penobscot Building
           645 Griswold
           Detroit, Michigan 48226
           (313) 256-9833

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................... i

STATEMENT OF JURISDICTION........................................................................... ii

STATEMENT OF QUESTIONS PRESENTED ....................................................... iii

STATEMENT OF FACTS............................................................................................1

    Introduction/Case Overview ....................................................................................1
    Pre Trial Proceedings...............................................................................................2
    The police arrest Mr. Craighead ..............................................................................2
    The police investigation...........................................................................................4
    The Interrogation .....................................................................................................5
    The Defense Case (at the Evidentiary Hearing) ......................................................6
    The Lower Court's Opinion......................................................................................7
    Trial Proceedings ....................................................................................................8
    Post Conviction Proceedings .................................................................................13

I.    WHERE THE DETROIT POLICE OFFICERS VIOLATED MR. CRAIGHEAD'S
      CONSTITUTIONAL RIGHTS BY ARRESTING HIM WITHOUT PROBABLE
      CAUSE AND ILLEGALLY HOLDING HIM UNTIL HE ADOPTED AN
      INCRIMINATING STATEMENT THIS STATEMENT MUST BE SUPPRESSED AS
      THE FRUIT OF THE ILLEGAL ARREST. ...................................................14

    A.   Issue Preservation and Standard of Review.....................................................14
    B.   The Constitutional Provisions...........................................................................14
    C.   Systemic Problems with the DPD Come to Light - The Detroit Police Department and the
    Federal Court Consent Judgment - ......................................................................15
    D.   Officer Fisher Did Not Have Probable Cause to Arrest Mr. Craighead ............17
    E.   Evidence obtained incident to the arrest should have been suppressed.............21

II.   TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO
      PRESENT AN EXPERT WITNESS REGARDING THE PHENOMENON OF FALSE
      CONFESSIONS. ...............................................................................................23

SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT ..............29

VRN*Brief on Appeal.doc*20935 August 9, 2005
Mark Craighead

# TABLE OF AUTHORITIES

## CASES

Blackburn v Foltz, 828 F2d 1177 (6th Cir. 1987)............................................................ 24

Brown v Illinois, 422 US 590; 95 S Ct 2254; 45 L Ed 2d 416 (1975)........................................... 22

People v Boyd, 65 Mich App 11; 236 NW2d 744 (1975) ............................................................ 28

People v Carines, 460 Mich 750; 597 NW2d 130 (1999)........................................................ 15; 23

People v Henry, 239 Mich App 140; 607 NW2d 767 (1999) ....................................................... 24

People v LaVearn, 448 Mich 207; 528 NW2d 721 (1995) ........................................................ 25

People v Lewis, 160 Mich App 20; 408 NW2d 94 (1987) ......................................................... 19

People v Mitchell, 138 Mich App 163; 360 NW2d 158 (1984)................................................... 19

People v Reed, 393 Mich 342; 224 NW2d 867 (1975)............................................................ 19

Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984) .................... 24; 25

Taylor v Alabama, 457 US 687; 102 S Ct 2664; 73 L Ed 2d 314 (1982)............................... 22; 23

United States v Arivizu, 534 US 266; 122 S Ct. 744, 151 L Ed 2d 740 (2002) .......................... 19

United States v Green, 111 F3d 515 (7th Cir. 1997) ................................................... 22

Whitely v Warden, 401 US 560; 91 S Ct 1031; 28 L Ed 2d 306 (1971) ...................................... 18

Wong Sun v United States, 371 US 471; 83 S Ct 407, 9 LEd2d 441 (1963)................................. 22

## CONSTITUTIONS

US Const, amend IV ............................................................................................... 15, 18

U.S. Const., amend VI .............................................................................................. 24

Mich Const 1963, art 1, § 11 ......................................................................................... 18

## STATEMENT OF JURISDICTION

Defendant-Appellant was convicted in the Wayne County Circuit Court by jury trial and a Judgment of Sentence was entered on August 5, 2002. A Claim of Appeal was filed on August 9, 2004 by the trial court pursuant to the indigent defendant's request for the appointment of appellate counsel dated February 26, 2004, as authorized by MCR 6.425(F)(3). This Court has jurisdiction in this appeal as of right provided for by Mich Const 1963, art 1, §20, pursuant to MCL 600.308(1); MCL 770.3; MCR 7.203(A), MCR 7.204(A)(2).

13-53846-tjt    Doc 13803-5    Filed 10/27/23    Entered 10/27/23 14:32:28    Page 5 of 70

# STATEMENT OF QUESTIONS PRESENTED

I. WHERE THE DETROIT POLICE OFFICERS VIOLATED MR. CRAIGHEAD'S CONSTITUTIONAL RIGHTS BY ARRESTING HIM WITHOUT PROBABLE CAUSE AND ILLEGALLY HOLDING HIM UNTIL HE ADOPTED AN INCRIMINATING STATEMENT MUST THIS STATEMENT MUST BE SUPPRESSED AS THE FRUIT OF THE ILLEGAL ARREST?

> Trial Court answers, "No".

> Defendant-Appellant answers, "Yes".

II. WAS TRIAL COUNSEL CONSTITUTIONALLY INEFFECTIVE IN FAILING TO PRESENT AN EXPERT WITNESS REGARDING THE PHENOMENON OF FALSE CONFESSIONS?

> Trial Court answers, "No".

> Defendant-Appellant answers, "Yes".

# STATEMENT OF FACTS

### Introduction/Case Overview

Mark Craighead is currently incarcerated after having been convicted by jury of manslaughter[1] (MCL 750.321) and felony firearm (MCL 750.227b) in the shooting death of Mr. Craighead's good friend Chole Pruitt. (Trial Transcript Volume 4 (T 4[2]) 3-4)   There was no physical or eyewitness evidence that pointed to Mark Craighead being involved.

The only evidence that supported this conviction, as stated by the prosecutor in opening statements, was a statement (T 1, 213-219), which the police claimed Mr. Craighead made while in custody.  The statement indicated that the shooting occurred during a struggle over a gun.

The evidence, however, showed that Mr. Pruitt had been shot multiple times, not at close range (from a distance of about four feet according to the medical examiner).  At least two of the shots appeared to have been fired while Pruitt was prone on the ground, as determined by the spent bullets found lodged in the underside of the carpeting beneath where the body was found. (T 2, 45)

Further, the statement did not address why Mr. Pruitt's truck was driven into Redford and set on fire or why it appeared that someone had been searching certain areas of the apartment.

Mr. Craighead did not kill Pruitt and did not know who had.  In 1997, he was working the night shift at Sam's Club on June 26th to June 27th and the building was locked during his shift, as it always was, so he could not have left undetected.  He did not tell the police that he shot Pruitt and only signed the statement because his interrogator, Barbara Simon, told him he would

---

[1] The jury acquitted Mr. Craighead of first- and second-degree murder.
[2] This was a four day trial with the fourth day being a continuation of jury deliberations.  The trial volumes begin with Volume 1, June 19, 2002 and go through Volume 4 (verdict) June 25, 2002.

be in prison for the rest of his life if he did not sign it. After being arrested, held overnight and not being allowed contact with anyone, he felt he had no choice but to comply with the police.

### Pre Trial Proceedings

The defense moved prior to trial to suppress the police statement that Mr. Craighead adopted after being arrested at his home three years after the crime had occurred and being held incommunicado, despite his brother's presence at the police station.

The pretrial proceedings dealt primarily with the Officer James Fisher's re-investigation into the case, which began in 2000[3].

### The police arrest Mr. Craighead

On June 20, 2000 Fisher went to Mr. Craighead's home along with his supervisor Billy Jackson. (EH I, 19-20) Although Mr. Craighead was not at home, Fisher spoke with someone who told him where he might be found. The police left but returned after they were unable to locate Mr. Craighead. (EH I, 20-21)

The police were on Mr. Craighead's front porch when Mr. Craighead and his brother arrived home. Fisher introduced himself to Mr. Craighead and asked him to come with him to the Homicide Department to talk about the Pruitt case. Mr. Craighead indicated he was willing to talk with the police but wanted to come to the station the following day.

Fisher told Mr. Craighead that was unacceptable and he wanted to talk with him now. Fisher told Mr. Craighead that he, Fisher, "needed to do it today" and would not allow Mr. Craighead to do as he wanted, which was to come to the station the next day. (EH I, 53) Fisher refused to allow him to come to the station the following day because he had "deemed in my mind that he was a suspect." (EH I, 21) However, the police never told Mr. Craighead he was a suspect in the homicide. (EH I, 54, 89)

2

Fisher refused to allow Mr. Craighead to enter his home and let Mr. Craighead know that he was going to accompany him to the station without further discussion. (EH I, 73-74) After Fisher did not allow Mr. Craighead to refuse his request to immediately accompany him to the station, Mr. Craighead "didn't put up too much of a hassle." According to Fisher, Mr. Craighead then went with him and Jackson voluntarily and was not handcuffed. (EH I, 22) Fisher described the interaction as he told Craighead he was going to the station with the police and Craighead complied. (EH I, 74)

Fisher arrived at the police station with Mr. Craighead around 7:00 pm. They talked a bit, and, according to Fisher, Mr. Craighead's information did not add up to him because it was not consistent. Fisher therefore decided to have Investigator Simon talk with Mr. Craighead and he had no further interaction with him after about 9:00 pm. (EH I, 24-27)

Fisher told Simon that he thought Mr. Craighead was lying (EH I, 65, 66) and believed that he told Simon that Mr. Craighead "was staying." (EH I, 71) According to Fisher, Craighead was not free to leave once he was in the squad room. He told Craighead he was staying and he based that decision on inconsistencies in what Craighead was saying. (EH I, 70) Fisher told Simon that Craighead was staying prior to Simon interviewing him because Fisher believed Mr. Craighead to be the prime suspect based on his subjective conclusion that Mr. Craighead was not being truthful. (EH I, 74-75, 80)

Lieutenant Billy Jackson went with Fisher to Mr. Craighead's home. At that point of their investigation they had not excluded other people as suspects, but their main focus was on Mr. Craighead and he was their starting point. (EH I, 87) According to Jackson, the Detroit police do not necessarily obtain arrest warrants if they have probable cause to arrest someone. (EH I, 86)

---

[3] The crime occurred in 1997.

3

Jackson was on the porch with Fisher when Mr. Craighead arrived home. He and Fisher did not allow Craighead into his home and did not tell him he was a suspect. (EH I, 89) While talking with Mr. Craighead he used his radio to see if a scout car was available. Scout cars are good back-up and Jackson likes to have one if possible because sometimes people do not believe he is a police officer. (EH I, 91-92)

**The police investigation**

During the course of the three year investigation, the police interviewed 25 people. Mr. Craighead, who was a good friend of Pruitt's, was interviewed twice. According to Fisher there was no physical evidence linking Mr. Craighead to this incident. (EH I, 45)

A Mr. Gibson was the only person of the 25 interviewed to bring up Mark Craighead. Gibson claimed that Mr. Craighead and Mr. Pruitt were trying to sell drugs together. (EH I, 12-13) Fisher reviewed Gibson's statement but was unable to recall if he actually spoke with him. (EH I, 28-29) Further, Fisher did not recall making any notes during his investigation. (EH I, 30)

Fisher spoke with the deceased's nephew and a female. He took no written notes of these interviews.

Mr. Pruitt's nephew Charles told Fisher the same information he had told Investigator Tate in 1997. (EH I, 7, 8, 9-10) Pruitt's nephew told Fisher that he saw his Uncle on June 25th and that there was a black male in his vehicle with him. He did not really see the passenger's features. (EH I, 10-11) When the police interviewed Carlton Pruitt in 1997, he told them he saw someone with Chole Pruitt that day and described the person he saw as a short, light-complected black male, which according to Fisher, could describe Mr. Craighead. (EH I, 14-15)

From reviewing the witness statements, Fisher determined that he "needed to look at" Mr. Craighead. (EH I, 11-12) Fisher wanted to "look at" Mr. Craighead based on statements

that Mr. Craighead and Mr. Pruitt were best friends, which meant that Mr. Craighead would have had access to Mr. Pruitt's apartment and perhaps knowledge that Mr. Pruitt had recently settled a lawsuit for a large sum of money.[4]. (EH I, 14)

Fisher testified that another important fact for him was that Mr. Craighead, at the time of the incident, lived at 23644 Schoolcraft and Mr. Pruitt's vehicle was found in Redford Township, which, according to Fisher, was around 1 to 1-1/2 miles from Craighead's home. (EH I, 17-18) However, Fisher admitted that assuming that mile roads were so named because there was a mile from one to the other, that Pruitt's truck was actually found farther than 1 – 1 ½ miles from Mr. Craighead's home. (EH I, 46-47) At trial there was testimony that the distance was anywhere from 3 ½ to 5.8 miles.[5].

**The Interrogation**

Barbara Simon first saw Mr. Craighead when Jackson and Fisher brought him to the Homicide department on June 20th but did not speak with him until June 21st. (EH II, 5, 6, 13) She spoke with Mr. Craighead in order to obtain a statement from him. (EH I, 6) Simon took Mr. Craighead for a polygraph examination around 2:00 or 3:00 am and interrogated him sometime after the polygraph. (EH II, 9, 20)

On day three of the evidentiary hearing Simon was unable to attend due to an illness and the person who administered the polygraph also failed to show for the hearing. The defense waived their presence. (EH III, 3-4)

---

[4] James Fisher testified to obtaining a copy of a bank check in the name of Chole Pruitt for $7000.00 and that the majority of the money was deposited to Pruitt's credit union account. $2000.00 was taken out in cash.
[5] At trial, Detroit Police Investigator Ronald Tate, who was initially in charge of the investigation and interviewed Mr. Craighead twice, testified that Mr. Craighead lived 3 ½ to 5 miles away from where Mr. Pruitt's truck was found. (Trial Transcript Volume 2, 103) Milton Craighead, Sr. also testified about this distance, finding that it was 5.8 miles from Mr. Craighead's home to where Pruitt's vehicle was found. (T3, 43-44)

**The Defense Case (at the Evidentiary Hearing)**

Randle Craighead, Mr. Craighead's brother, was with Mr. Craighead on that Tuesday when the police were at Mr. Craighead's house. Mr. Craighead spoke with the police for about twenty minutes out on his front porch and told the police he was willing to come to the station the next day to talk with them. Mr. Craighead told the police he had been working all day and had not had a lot of sleep. (EH III, 9-11)

When the police told Mr. Craighead he had to go downtown with them immediately, Mr. Craighead asked if he could go inside his home to change clothes and call an attorney. The request was refused. (EH III, 12-14)

Randle followed the police and his brother downtown. He waited from 6:30 to 11:30 pm to talk with his brother but was not allowed to do so. (EH III, 17)

Michael Heslip was at Mr. Craighead's house when the police arrived initially and when they returned. He saw the police talking with Mr. Craighead and standing in front of the door. (EH III, 30-32)

Milton Craighead Sr., Mr. Craighead's father, spoke with Fisher and asked him why he was holding his son and asked if his son had seen an attorney. (EH III, 43) He also called and spoke with Investigator Richardson who told him that his son was being held for murder. (EH III, 44)

Mr. Craighead testified that he was working the 5:00 am to 3:00 pm shift on the assembly line for Chrysler in June 2000. He woke for work at 3:00 am on June 20th, which was the day the police arrived at his home and took him to the station (EH III, 51-52) The officers did not allow him to go inside his home or call an attorney. (EH III, 81)

**The Lower Court's Opinion**

Judge Richard Hathaway gave his decision from the bench on February 21, 2001.

(Opinion) The Judge first found that the police properly administered Miranda warnings to Mr.

Craighead and that he was held less then 24 hours before giving a statement. (Opinion at 4-5)

The Court next found that "probable cause in this particular matter was in fact met"

stating with regard to this issue:

> "I do believe that probable cause in this particular matter was
> in fact met; that the investigative officer in this particular case, I
> believe his name was Fisher, did tell this Court that it was his
> understanding and belief that this particular defendant was with Mr.
> Pruitt on the day that he passed; that they were going to be involved
> in some type of enterprise; that the victim's car was found
> approximately a mile and a half from the residence of the defendant
> in this particular cause.
>
> I do believe that probable cause in fact has been met for the
> appropriate arrest in this particular cause." (Opinion at 5)

The Judge next found that the statement was voluntarily given in that although Mr.

Craighead was tired he was not "lacking in food or water." (Opinion at 5-6)

In conclusion the Judge noted that this was a "unique case; that the police in this

particular cause decided to re-look at this particular defendant after a few years' time lapsed."

(Opinion 6) He then sua sponte granted bond to Mr. Craighead who was charged with first-

degree murder, an offense for which the trial court may deny pretrial release without reason.

MCR 6.106 (B)(1)(a)(i). (Opinion at 6-7)

**Trial Proceedings**

Chole Pruitt was shot and killed in his apartment sometime during the evening of June

26, 1997 or early morning hours of June 27, 1997. His body was found on June 27, 1997 by two

painters who accidentally went to the wrong apartment and entered after finding the door

7

unlocked. (T 1, 245-247) The painters called the apartment manager, who was a friend of Pruitt's before he moved in, and, according to the deceased's father, may have had a relationship with him. (T 1, 243, 247; T 2, 9)

The apartment manager, Ms. Miller, had an apartment close to Pruitt's and had not received any complaints about gun shots. (T 2, 13-14) After seeing the body on the floor of the apartment she called the police. (T 2, 7) She was aware that Pruitt had some previous problems with people tampering with his vehicle. (T 2, 16)

The evidence technician who processed Pruitt's apartment found no signs of forced entry into the complex or Pruitt's apartment. (T 2, 41) He found no usable fingerprints on the premises. (T 2, 43) He referred to the disarray in the bedroom of Pruitt's apartment as selective searching as there were no signs of typical ransacking. (T 2, 42, 55) He recovered jewelry from Pruitt's body. (T 2, 56-57)

The evidence technician found bullet strikes in bi-fold doors in front of the dryer and in the dryer. (T 2, 43) He recovered two fired bullets and 4 spent bullets. Once the body was removed he "examined the floor and recovered two fired bullets that were --- had passed apparently through the body, into the carpeting, and were lodged between the carpet underside and the floor of the hallway." (T 2, 45, 48) He also found two boxes of live ammunition in Pruitt's apartment; ammunition for a 38 caliber and a 30 caliber weapon. (T 2, 58)

Pruitt died as a result of multiple gunshot wounds. (T 2, 65) He had 2 gunshot wounds in his back, was shot through the left thigh and through the right side of his neck. (T 2, 62-64) There was no evidence of close range firing. (T 2, 64)

Melvin Howard knew Pruitt and Mr. Craighead and knew that they were close friends. (T 2, 74-75) He saw Pruitt on June 26th and Pruitt was at Howard's home when Milton Craighead Sr. stopped over that same day. (T 3, 39, 42)

Ronald Tate was the Officer in Charge of this case in 1997. (T 2, 79, 83) He twice interviewed Mr. Craighead, once in 1997 and again in 1999. Tate testified that both times Mr. Craighead told him that he and Pruitt were friends and they went to lunch on June 26, 1997 and he dropped him off late in the afternoon. (T 2, 80-81, 82)

Tate later clarified this testimony after refreshing his memory by reviewing the written statements. Mr. Craighead had told him that he was not sure what day he had gone to lunch with Pruitt and thought it had been either the Wednesday or Thursday before he had learned of Pruitt's death. (T 2, 92) Mr. Craighead told him that Pruitt had come by his house and they had gone to Friday's for drinks sometime in the late afternoon. Pruitt then dropped Mr. Craighead off at Mr. Craighead's home. Mr. Craighead later learned that Pruitt next went to Melvin Howard's home. (T 2, 93, 97)

Mr. Craighead told Tate during both interviews that he worked at Sam's Club in Farmington Hills. (T 2, 97)

Although Pruitt was shot with 44 caliber bullets, the police did not recover a 44 caliber weapon and did not recover any weapon that could have fired 44 caliber bullets. (T 2, 85-86, 88, 103) All four of the recovered bullets were fired from the same weapon. (T 2, 162)

9

According to Tate, Mr. Craighead lived, at the time of the incident, 3 ½ to 4 miles from where Pruitt's burned-out truck was found in Redford[6]. (T 2, 103) Milton Craighead Sr. found the distance between Mark Craighead's home and Pruitt's burned-out vehicle to be 5.8 miles.

On June 20, 2000 Investigator James Fisher and Lieutenant Jackson went to Mr. Craighead's home to speak with him about Pruitt's death. (T 2, 145) Mr. Craighead was willing to talk with the officers but wanted to speak with them the next day and was pretty adamant about waiting until the next day to speak with them because it was late and he had been working all day. (T 2, 148-150) Fisher wanted Mr. Craighead to come to the police station immediately and denied making any reference to a scout car coming to take him to the police station. (T 2, 150) According to Fisher, Mr. Craighead agreed to go to the police station and rode with the officers while his brother followed. (T 2, 150-151) Mr. Craighead's brother was not allowed onto the Homicide floor of the station. (T 2, 151)

Mr. Craighead was held in the Ninth Floor lock-up overnight and a decision was made to have Investigator Simon question Mr. Craighead. (T 2, 154-155) Fisher had Investigator Simon question Mr. Craighead because her interrogation skills were better than his and Fisher hoped that because of her skills Mr. Craighead would say something. (T 2, 156-157)

Fisher himself had no conversation regarding the case with Mr. Craighead. (T 2, 158)

Investigator Barbara Simon first spoke with Mr. Craighead at the police station on June 20, 2000. (T 2, 112) Mr. Craighead was in police custody on June 20th but she did not interview

---

[6] On June 27, 1997 at approximately 2:35 am Redford police officer Lawrence Turner responded to a call about a car fire. The vehicle was a 1996 Chevy Tahoe registered to Chole Pruitt. (T 2, 18-20) Turner saw only one set of tire tracks and could not tell if the steering column of the vehicle was damaged. (T 2, 20, 22)

Leslie Wedge, the Redford Township Fire Marshall, found that gasoline was poured on the inside of the truck in two separate places and the fire was set from the inside. (T 2, 26-27) A 38 caliber handgun was found in the truck. (T 2, 27-28)

him at that time. Instead, he was held overnight and she interviewed him on June 21st. (T 2, 117-118, 121-122)

Simon interrogated Mr. Craighead on June 21st after he waived his rights and agreed to speak with her. (T 2, 106-108) She testified that she wrote out the questions she asked and his answers and then had Mr. Craighead review and sign the statement she had written out. (T 2, 109) The written document was read in its entirety into the record and the relevant transcript pages are attached as Appendix A. (T 2, 110-112) The relevant substance of the admitted document was that Mr. Craighead had been at Pruitt's home, they argued, but he could not remember why, Pruitt had a gun, they fought over the gun, the gun went off and Pruitt was shot, Mr. Craighead ran out of the apartment and went home. When specifically asked about the truck the statement indicates that Mr. Craighead drove the truck to Redford although he could not say where in Redford he had left it. *Id.*

Martin Ryzak was working as the business manager for Sam's Club in Farmington Hills in June 1997. (T 3, 8) Mr. Craighead worked as a full-time employee during that same time on the night shift, which ran from either 9:00 pm to 5:00 am or 10:00 pm to 6:00 am. (T 3, 9) The building was locked down at night. (T 3, 10, 13) Mr. Craighead was a good employee who generally worked Tuesday through Saturday. (T 3, 12, 14) There were no hourly time records for that time period because they had been damaged and subsequently discarded when a sprinkler head was damaged. (T 3, 11)

Randle Craighead was out with his brother running errands on June 20, 2000 and they returned to his brother's home to find two men on the porch. The two men identified themselves as police officers and said they wanted to talk with Mark about Chole's murder. (T 3, 21) Mark

11

invited the officers into his home and they said no, that they wanted to speak with him downtown. (T 3, 22) Randle followed them to police headquarters. (T 3, 25)

Michael Heslip was at Mr. Craighead's home when the police arrived on June 20th. (T 3, 35) Michael heard the police tell Mark that if he did not come with them they would radio for a scout car. (T 3, 38)

Mark Craighead lived at 23644 Schoolcraft in 1997 and worked the night shift as a stock man at Sam's Club. (T 3, 49-50) The week of Pruitt's death he worked Tuesday through Saturday. (T 3, 57)

Mr. Craighead was very good friends with Pruitt and saw him shortly before he was killed. Pruitt had come by his home and they went for drinks at Friday's. A lot of things had been happening to Pruitt and Pruitt wanted to move. (T 3, 55-56) Mr. Craighead did not see Pruitt again after their outing to Friday's. (T 3, 57-58)

Mr. Craighead did not kill Pruitt and did not know who had killed him. (T 3, 61, 72-73)

On June 20, 2000 Mr. Craighead was working at Chrysler and had worked the 5:00 am to 3:00 pm shift. (T 3, 62) He went downtown with the police because he did not want a confrontation with them. (T 3, 64-65)

The officers questioned him in the car and in the station and he told them he did not know anything more than he had already told them. (T 3, 67-68) Nothing in the statement that Simon read was true. He signed the statement because he was broken down and Simon told him he would otherwise be there for the rest of his life. (T 3, 87, 89)

Following jury instructions the jury sent out two notes. The jury wanted to know if there was a paycheck stub or evidence that Mr. Craighead had worked a 40 hour work week, wanted

Mr. Craighead's statement and wanted written instructions on second-degree murder and manslaughter. (T 3, 169, 174)

### Post Conviction Proceedings

Appellate counsel filed a timely motion for new trial raising the issues of new evidence and misleading evidence with regard to the initial ruling on the Motion to Suppress Mr. Craighead's statement. Judge Jones, who was the trial judge but not the Judge who presided over the Walker hearing, denied the motion. In denying the motion Judge Jones never ruled on the merits of the claims instead stating "I cannot change with (sic) Judge Hathaway has already decided. That you'll have to take to the Court of Appeals." (Hearing Transcript 5/17/05, 9) In response to argument about Officer Fisher's misrepresentations to Judge Hathaway at the suppression hearing, Judge Jones stated "I listened to it at trial, I would not have gone along with what I heard at trial at all. That's out of my hands." *Id.* at 11. (Order denying Motion for New Trial attached as Appendix B)

Following this ruling, appellate counsel filed a Motion for Reconsideration, which also added additional issues to the original New Trial Motion. This Motion was denied without hearing in a written Order issued June 27, 2005. (Order attached as Appendix C)

Mr. Craighead now appeals by right from his convictions and files this brief asking the Court to vacate the convictions or, in the alternative, reverse the convictions and remand for a fair trial.

**I.**     **WHERE THE DETROIT POLICE OFFICERS VIOLATED MR. CRAIGHEAD'S CONSTITUTIONAL RIGHTS BY ARRESTING HIM WITHOUT PROBABLE CAUSE AND ILLEGALLY HOLDING HIM UNTIL HE ADOPTED AN INCRIMINATING STATEMENT THIS STATEMENT MUST BE SUPPRESSED AS THE FRUIT OF THE ILLEGAL ARREST.**

**A.**     **Issue Preservation and Standard of Review**

This issue was preserved by trial counsel's motion to suppress the statement and the

evidentiary hearing held on this issue as well as appellate counsel's timely filed post conviction

motion on this issue. See, generally, Lower Court Records, Evidentiary Hearing Transcripts and

Post Conviction Transcripts.

Because this is preserved constitutional error, reversal is required unless the prosecution

establishes that the error is harmless. *People v Carines,* 460 Mich 750, 763-64; 597 NW2d 130

(1999)

**B.**     **The Constitutional Provisions**

**The Fourth Amendment to the United States Constitution states:**

> "The right of the people to be secure in their persons, houses, papers
> and effects, against unreasonable searches and seizures, shall not be
> violated, and no Warrants shall issue, but upon probable cause,
> supported by Oath or affirmation, and particularly describing the
> place to be searched, and the persons or things to be seized." United
> States Const, Am IV

**The Michigan Constitution, 1963 similarly states in relevant part:**

> "Sec. 11.  The person, houses, papers and possessions of every
> person shall be secure from unreasonable searches and seizures.  No
> warrant to search any place or to seize any person or things shall
> issue without describing them, nor without probable cause, supported
> by oath or affirmation." Mich Const 1963, Art 1, sec 11.

## C. Systemic Problems with the DPD Come to Light - The Detroit Police Department and the Federal Court Consent Judgment -

The facts bear out that Officers Fisher and Jackson arrived at Mr. Craighead's home knowing they did not have probable cause to arrest him. Knowing they could not handcuff him and arrest him without probable cause, Fisher and Jackson engaged instead in a subterfuge whereby the officers would force Mr. Craighead to come with them and then could say he accompanied them voluntarily. The trial court never addressed this aspect of the arrest.

What happened at Mr. Craighead's home is not in dispute. When Mr. Craighead arrived home with his brother the police were on his front porch waiting for him. The officers refused Mr. Craighead entry into his home and were unrelenting in their "requests" that he go to the police station with them immediately, refusing to allow him to come downtown the following day after he got some rest and could speak with an attorney. The police gave no reason why this need was immediate given that three years had passed since the shooting incident and Mr. Craighead had remained in Detroit, was available, had cooperated with the police in the past and remained cooperative.

Unfortunately, the police conduct in this case was all too familiar and has been found to be blatantly illegal. This is borne out by two particular documents. The first is the June 5, 2002 letter to Corporation Counsel Ruth Carter from Steven H. Rosenbaum, Chief Special Litigation Section of the United States Attorney's Office. In the June 5th letter, Attorney Rosenbaum indicated that the Detroit Police Department:

> "defines an arrest as 'a taking of an individual into custody for further investigation, booking or prosecution', this policy implicitly permits the arrest of an individual with less than probable cause as a means to facilitate an investigation. Indeed, some former DPD employees informed us that it was acceptable practice to arrest suspects without probable cause and then continue to investigate the case to develop probable cause prior to arraignment. Gathering additional evidence after an arrest in

> order to establish probable cause for that arrest is
> **unconstitutional. County of Riverside v McLaughlin**, 500 U.S.
> 44, 56 (1991)" (emphasis added)(Letter attached as Appendix D)

The second location for an explanation is the Consent Judgment that Judge Julian Abele

Cook entered, which required, among many other relevant requirements, that officers must be

instructed "that the **'possibility' that an individual committed a crime does not rise to the**

**level of probable cause.**" (emphasis added)  The Consent Judgment further instructed that the

officers be given:

> "examples of scenarios faced by DPD officers and interactive
> exercises that illustrate proper police-community interactions,
> including scenarios which distinguish an investigatory stop from an
> arrest by the scope and duration of the police interaction; **between**
> **probable cause, reasonable suspicion and mere speculation; and**
> **voluntary consent from mere acquiescence to police authority.**"
> (emphasis added) (Consent Decree attached as Appendix E)

The facts of this case bear out all too well the problems that were infecting the Detroit

Police Department at the time of this investigation and which ultimately led to entry of the

Consent Judgment.  Officers Fisher and Jackson engaged in a textbook list of illegal tactics in

order to extract an incriminating statement from Mr. Craighead because they believed, i.e.,

speculated that he was responsible for the shooting.

There can be no question but that Mr. Craighead was under arrest from the moment he

arrived home.  He did not voluntarily go with the police downtown; he merely acquiesced to the

police authority.  He was held incommunicado as evidenced by the police refusing his brother,

who accompanied him to the station, to have contact with him.

Further, even if not under arrest at his home, Fisher admitted that he did not even try to

obtain a warrant until after Mr. Craighead signed the incriminating statement and that Mr.

Craighead was under arrest the moment he arrived at the station. (EH I, 50, 70-71, 72)  Given

Fisher's testimony that he had no discussions with Mr. Craighead about the case, nothing happened to justify Mr. Craighead's detention even if the initial contact was voluntary. (T 2, 144)

Contrary to the trial court's assertion that he may have been tired but was not "actually lacking in any sleep" (Opinion at 5-6) is the testimony of Officers Fisher and Simon. Fisher brought Mr. Craighead to the station at 7:00 pm and had no contact with him after 9:00 pm. Simon had no contact with Mr. Craighead until the next day (6/21) when she took him for a polygraph examination around 2:00 or 3:00 am. (EH II, 20) Mr. Craighead had been up since 3:00 am on 6/20, worked the entire day, was running errands after work, was arrested and brought to the station and was taken for a polygraph at 2:00 or 3:00 am. One can only conclude that given the circumstances he had little or no chance for any sort of relaxing sleep as he had been awake for most, if not all, of the 24 hours prior to being taken for the polygraph examination.

The officers arrested Mr. Craighead without probable cause in order to continue the investigation in a manner that was suitable to them. The DPD's internal policies allowed for arrests without probable cause. However, those internal policies were and are unconstitutional. This Court can not and should not allow the illegal police practices to be condoned. Mr. Craighead's convictions must be reversed.

### D. Officer Fisher Did Not Have Probable Cause to Arrest Mr. Craighead

Officers Fisher and Jackson lacked probable cause to arrest Mr. Craighead. With or without a warrant, the Fourth Amendment requires that an arrest be supported by probable cause. *Whitely v Warden,* 401 US 560, 566; 91 S Ct 1031; 28 L Ed 2d 306 (1971); US Const, Am IV. Michigan law parallels the federal constitutional standard. *See* Mich Const 1963, art 1, § 11; MCL 764.15 (d).

17

Probable cause to arrest exists when the facts and circumstances within the officers' knowledge are sufficient to a prudent person, or one of reasonable caution, to believe that the suspect has committed or is committing a felony. *People v Mitchell,* 138 Mich App 163, 167; 360 NW2d 158 (1984). Facts which constitute mere suspicion, inarticulate hunches and vague beliefs of criminal involvement do not amount to probable cause. *See, e.g., United States v. Arivizu,* 534 US 266; 122 S Ct. 744; 151 L Ed 2d 740 (2002) (hunch does not rise to level of probable cause). Where there is no probable cause to arrest, but the police take a defendant into custody for investigatory purposes, any evidence obtained as a result of that unlawful detention or any statement made while unlawfully detained must be suppressed. *People v Lewis,* 160 Mich App 20, 25; 408 NW2d 94 (1987). The prosecution bears the burden of demonstrating probable cause for a warrantless arrest. *People v Reed,* 393 Mich 342; 224 NW2d 867 (1975).

Here, the prosecution never established that the police had probable cause to believe that Mr. Craighead had committed a crime at or prior to the moment that Mr. Craighead signed the incriminating statement, which was signed over 12 hours after his illegal arrest. In fact, Officer Fisher's testimony demonstrates that far from having probable cause to arrest he merely had a suspicion based on reviewing the police work of other officers that Mr. Craighead was the perpetrator. Further, even if Fisher believed he had probable cause to arrest, there is no excusing his failure to present the evidence he had to a judge for issuance of an arrest warrant. Fisher's failure to do so is especially troubling given that the crime had occurred three years prior to his deciding that Mr. Craighead was the perpetrator, Mr. Craighead remained a Detroit resident and working member of the community and there was no evidence of any circumstances justifying Fisher's actions of arresting Mr. Craighead without a warrant.

Fisher based his belief that Mr. Craighead shot Chole Pruitt on two main premises, one of which was faulty and one of which was the same information that other officers had reviewed and had not deemed worthy of further investigation let alone probable cause for an arrest.

The falsity that Mr. Craighead lived approximately 1 to 1-1/2 miles from where Mr. Pruitt's vehicle was found was the primary fact that Fisher used to support his belief that Mr. Craighead committed this killing. This "fact" was also central to the trial court's finding that probable cause existed for the arrest. This is a faulty premise in that Fisher himself admitted that in taking a rough calculation of mile road to mile road; it was farther than 1 to 1-1/2 miles from Mr. Craighead's home to the vehicle. At trial Officer Tate, the original officer in charge of the case and the officer who had twice interviewed Mr. Craighead (T 2, 79, 83), testified that it was 3 ½ to 4 miles from Mr. Craighead's home to where the vehicle had been found. (T 2, 103) Mr. Craighead's father testified to the distance being 5.8 miles. There can be no doubt that Fisher, who claimed at the evidentiary hearing that he drove the route in his police vehicle and the distance was 1 to 1 ½ miles, ((EH I, 17-18, 46-47) lied about the distance involved and used that lie as his main premise for the claim that he had probable cause to arrest Mr. Craighead.

Fisher's review of the police statements and discussions with someone who saw Mr. Pruitt with a black male who could have been Mr. Craighead adds nothing to the probable cause analysis. Being with someone at some point in the day prior to the person being shot that night does not rise to the level of probable cause for an arrest, especially when it is undisputed that the two were good friends and regularly spent time together.

The third point the Judge mentioned in determining that there was probable cause to arrest Mr. Craighead was the witness statement of Mr. Gibson, taken in 1998, that he thought that Mr. Pruitt and Mr. Craighead may have been trying to sell drugs together. This was an

unsubstantiated claim and one the police knew of since the start of the investigation. It is also a claim that is irrelevant to the police theory that Mr. Pruitt was killed by someone who knew he had recently received a monetary settlement.

The trial court further failed to take into account the circumstances surrounding the arrest. Officer Jackson admitted that the Detroit Police do not always obtain a warrant even when they have probable cause for an arrest. Jackson's statement underlies the problems besieging the Detroit police department and the citizens of the City whose rights are being trampled every day by a cavalier attitude toward the Constitution. There is no justification for failing to obtain a warrant in this case where the incident happened three years prior, the police suspect is a life long resident of Detroit who lives and works in the City, the suspect has been cooperative in the past and was willing to be cooperative with these officers and there is nothing to indicate any immediate need for arrest. The officers' forceful actions speak volumes about what happened in this case and the legal strength of their case at the time of arrest. There is absolutely no justification for failing to request and obtain an arrest warrant. The only reason the police did not submit a warrant request was because they knew there was no probable cause for an arrest. The police also knew that they had to wear down Mr. Craighead if there was any hope of obtaining an incriminating statement from him, which explains the surprise tactics and the desire to have him in their custody without access to family members or an attorney.

Fisher, while testifying that Mr. Craighead voluntarily accompanied him to the station, admitted that once he was at the station Mr. Craighead was not free to leave. He testified that Mr. Craighead was under arrest at that point because Fisher thought Mr. Craighead's answers to his questions were inconsistent with other evidence. Inconsistency is the same reason Fisher gave for wanting to question Mr. Craighead after reviewing the witness statements that the police

had previously obtained. Again, Fisher's subjective beliefs do not and can not pass for probable cause.

**E. Evidence obtained incident to the arrest should have been suppressed.**

Under the fruit of the poisonous tree doctrine, evidence obtained through exploitation of an illegal detention is subject to suppression. *Wong Sun v United States,* 371 US 471, 486; 83 S Ct 407, 416; 9 LEd2d 441 (1963). The test is whether the challenged evidence has been obtained by exploitation of the illegality or instead by means sufficiently distinguishable to be purged of the primary taint. *Id.* Three factors to be considered in determining whether the causal chain is sufficiently attenuated are: (1) the time elapsed between the illegality and the acquisition of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *United States v Green,* 111 F3d 515, 521 (7th Cir. 1997), citing *Brown v Illinois,* 422 US 590, 603-04; 95 S Ct 2254; 45 L Ed 2d 416 (1975).

Applying these factors to Mr. Craighead's case, there can be no doubt that his statement was the fruit of the illegal arrest:

> (1) The statement was given only after Mr Craighead was held incommunicado for a significant period of time.
>
> (2) There were no intervening events other than the Miranda warnings. Miranda warnings do not cure an illegal arrest, and do not by themselves break the causal link between the illegal arrest and the statement, although they can be a factor to be considered. The United States Supreme Court has firmly established that the fact that a confession may be "voluntary" for purposes of the Fifth Amendment, in the sense that Miranda warnings were given and understood, is not by itself sufficient to purge the taint of the illegal arrest. *Brown v Illinois, supra,* 422 US at 602-603; *Taylor v Alabama,* 457 US 687; 102 S Ct 2664; 73 L Ed 2d 314 (1982).
>
> (3) Arrests for investigation of a crime on mere suspicion are considered flagrant misconduct. *See Brown,* 422 US at 605; *Taylor,* 457 US at 689-690. Here, as in those cases, "the police effectuated an investigatory arrest without probable cause... and involuntarily

21

transported petitioner to the station for interrogation in the hope that
something would turn up." *Taylor,* 457 US at 693.

Because this is preserved constitutional error, reversal is required unless the prosecution

establishes that the error is harmless. *People v Carines,* 460 Mich 750, 763-64; 597 NW2d 130

(1999). The prosecution cannot meet that burden. Mr. Craighead's unrecorded statement that he

shot Mr. Pruitt after a struggle for the gun was the only evidence to support his conviction for

manslaughter and felony firearm. Consequently, there is no argument that can be put forth that

the statement was cumulative to other evidence or that its admission was otherwise harmless

error. Mr. Craighead's convictions must be reversed.

## II. TRIAL COUNSEL WAS CONSTITUTIONALLY INEFFECTIVE IN FAILING TO PRESENT AN EXPERT WITNESS REGARDING THE PHENOMENON OF FALSE CONFESSIONS.

**Issue Preservation and Standard of Review**.

Mr. Craighead may raise this ineffective assistance of counsel claim for the first time on appeal because it involves a constitutional error that likely affected the outcome of the trial. *People v Henry*, 239 Mich App 140, 146; 607 NW2d 767 (1999) (defendant may raise ineffective assistance of counsel for the first time on appeal, with review limited to mistakes apparent in the record). The performance and prejudice prongs of an ineffective assistance of counsel claim are mixed questions of law and fact that are reviewed de novo. *Strickland v Washington*, 466 US 668, 698; 104 S Ct 2052; 80 L Ed 2d 674 (1984); *Blackburn v Foltz*, 828 F2d 1177, 1181 (6th Cir. 1987).

**Analysis.**

Mr. Craighead had the right under the federal and state constitutions to the effective assistance of counsel. U.S. Const., amend VI; Const. 1963, Art. 1, § 20; *Strickland*, 466 US at 668. To prevail on an ineffective assistance of counsel claim, a defendant must meet two criteria. He must first "show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not performing as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland, supra*, at 687. In so doing, the defendant must overcome a presumption that counsel's performance was the result of sound trial strategy. *Id.* at 690. Second, the defendant must show the deficient performance was prejudicial. *Id.* at 687. Prejudice is established where there is a reasonable probability that, but for counsel' error,

the result of the proceeding would have been different. *Id.* at 694; *People v LaVearn*, 448 Mich 207, 216; 528 NW2d 721 (1995).

As the prosecutor stated in opening statements and the Judge stated in post conviction proceedings, the statement attributed to Mr. Craighead was the primary, if not the sole piece of, evidence upon which a conviction could rest in this case. Mr. Craighead's defense was two pronged. First, he could not have committed the crime because in June 1997 he was working from the evening hours of June 26th until the early morning hours of June 27th and was unable to leave the premises without being detected because the building in which he worked was locked for the shift. Unfortunately for Mr. Craighead the actual time cards had been destroyed. Although he provided evidence that he worked during the week in question, he could not supply proof for the exact day/time period in question due to the destruction, by the company, of the actual time cards.

The second part of his defense was that although he signed the statement that Simon wrote out, thereby impliedly adopting the truth of it, he did so only because he was worn down and felt he had no choice but to acquiesce to what had been written for him. Given the imperfections with the alibi defense, it was critical that the jury was presented with something upon which to base an understanding of why someone would falsely confess to killing someone. As the prosecutor told the jury in rebuttal closing argument, why would Mr. Craighead say he did something that he did not do? (T 3, 136-137) Counsel, however, failed to present any such testimony.

The occurrence of false confessions is surprisingly common within the criminal justice system and society at large. See, Kassin, *Confessions: Psychological and Forensic Aspects*, International Encyclopedia of Social and Behavioral Sciences (2001). Aggravating the

24

widespread incidences of false confessions is the erroneous belief that a confession is an indisputable indication of guilt. Because it is so difficult for fact finders to fathom why anyone would willingly confess to a crime they did not commit, expert testimony on false confessions is critical, especially in cases where that confession is the only incriminating evidence.

Experts agree that during interrogations even well-intentioned officers can often end up producing false confessions. Kanabe, George. *Why Judges and Juries Should Have Access to Complete Electronic Recordings of Police Interrogations: Following Illinois's Example.* Findlaw's Legal Commentary, August 13, 2003. The police, as in this case, often lead suspects to believe that they have no other option but to confess. Those who initially assert their innocence, as Mr. Craighead did, come to the realization that denial will offer them no escape from police interrogation and they turn to anything that will allow them to escape the police questioning – sometimes a false confession. Kanabe, *supra*.

According to Steven Drizin, a professor at Northwestern University School of Law and an authority on false confessions, "it's a reaction to a feeling of utter hopelessness and despair that virtually anything I say about my innocence is going to be ignored, and my only way out of this interrogation room is to accede to the interrogator's demands." Marks, Alexandra. *Why People Confess to Crimes they Didn't Do.* The Christian Science Monitor, Dec. 5, 2002.

Other suspects may truly stop believing in their own innocence, in spite of the fact that they have committed no crime. Kanabe, 2003. "This is particularly likely to happen when the interrogator tells the suspect that incriminating evidence has been retrieved that undeniably identifies the suspect as the perpetrator of the crime in question – and when the interrogation is prolonged." Kanabe, 2003.

After Chole Pruitt was killed in June of 1997, Mark Craighead was fully cooperative with the police. He spoke with Investigator Tate on August 29, and a second time more than a year later on March 18, 1999. Investigator Tate testified at trial that during the second interview Mr. Craighead gave him the same information concerning his knowledge about the events surrounding Mr. Pruitt's death, consistent with their first meeting. (T 2, 97).

Circumstances surrounding both Mr. Craighead's arrest and the statement he gave to Investigator Simon suggest that it was at the very least improperly persuaded, or worse, aggressively coerced from him. On June 20, 2000 Mr. Craighead had worked a ten-hour shift on the Chrysler assembly line from 5:00 a.m. until 3:00 p.m. (EH III, 52). Hungry and still operating on a mere three hours of sleep, he arrived home in shorts and a dirty t-shirt to find Investigator Fisher and Lieutenant Jackson waiting on his porch around 6:00 in the evening. (EH III, 64).

Although Mr. Craighead was told he was not under arrest and that he was only needed for questioning at 1300 Beaubien, he was not allowed to leave once he went downtown with the officers, and he was not allowed to speak with anyone. (EH III, 81). At some point he was placed in a room at squad seven and left there for approximately three hours. (EH III, 85). Mr. Craighead testified at the Walker Hearing that Investigator Simon let him out of the room at 11:00 that night and lied, telling him that a witness had given her a written statement, that he was seen riding with Chole Pruitt the day he was killed. (EH III, 89). Mr. Craighead was given a polygraph examination sometime between 2:00 and 3:00 a.m., and then he was taken to a custody cell on the ninth floor of 1300 Beaubien. (EH III, 96-97). It was approximately 11:00 a.m. when Investigator Fisher brought Mr. Craighead back down to squad seven so that Investigator Simon could interrogate him further. (EH III, 99).

At this point Mr. Craighead had been locked up, with no outside contact and had consistently maintained his innocence and lack of any knowledge regarding his friend's death. His resolve, however, was being steadily and systematically worn away. The statement adopted, which bears little relationship to the actual facts behind the shooting[7], is not worthy of belief, let alone reliable as a sufficient basis for conviction.

Because of the difficulty people have believing and/or understanding why someone who is innocent would confess to a crime, the importance of expert testimony on this issue cannot be overstated. It is the job of an expert to explain things to the jurors that are outside of ordinary knowledge. *People v Boyd*, 65 Mich App 11 (1975). *See also* MRE 702.

In this case, expert testimony on false confessions could have prevented an innocent man from the injustices of a wrongful conviction. Mr. Craighead's "confession" does not match the facts of the crime. An expert would have helped the jury understand why Mr. Craighead, who had nothing to do with Chole Pruitt's death, would have "confessed" to such a crime. Given that false confessions result in a significant number of wrongful convictions, and given that defense

---

[7] The evidence showed that Mr. Pruitt had been shot multiple times and not at close range (from a distance of about four feet according to the medical examiner). The statement indicates that he was shot in a struggle over the gun. The statement thus indicates one shot at close range. At least two of the multiple shots borne out be the physical evidence appeared to have been fired while Pruitt was prone on the ground, as determined by the spent bullets found lodged in the underside of the carpeting beneath where the body was found. (T 2, 45)

Further, the statement did not address why Mr. Pruitt's truck was driven into Redford and set on fire or why it appeared that someone had been searching certain areas of the apartment.

counsel failed to present this relevant and critical evidence to the jury, Mr. Craighead is entitled
to a new trial where he is allowed to present an expert witness on false confessions.

# SUMMARY AND RELIEF AND REQUEST FOR ORAL ARGUMENT

**WHEREFORE**, for the foregoing reasons, Defendant-Appellant Mark Craighead asks that this Honorable Court vacate his convictions or, in the alternative, reverse the convictions and remand this case for a fair trial. Additionally, oral argument should be had in this matter so that counsel can address the Court's questions and/or concerns about the issues raised in this appeal.

Respectfully submitted,

**STATE APPELLATE DEFENDER OFFICE**

BY: _Valerie R_____

**VALERIE R. NEWMAN (P47291)**
Assistant Defender
3300 Penobscot Building
645 Griswold
Detroit, Michigan 48226
(313) 256-9833

Dated: August 9, 2005

29

**APPENDIX A**

THIRD JUDICIAL ~~CIRCUIT OF MICHIGAN~~ CRIMINAL DIVISION

COPY

THE PEOPLE OF THE STATE OF MICHIGAN,

      vs.                     Case No. 00-007900

MARK T. CRAIGHEAD,

           Defendant.

JURY TRIAL

BEFORE THE HONORABLE VERA MASSEY JONES
CIRCUIT COURT JUDGE

Detroit, Michigan - Thursday, June 20, 2002

APPEARANCES:

For the People:      FELEPE HALL (P58533)
                      Frank Murphy Hall of Justice
                      Wayne County Prosecutor's Office
                      1441 St. Antoine, 12th Floor
                      Detroit, Michigan 48226-2302
                      (313) 224-5777

~~For the Defendant:~~ ~~STEVEN F. FISHMAN~~ (P23049)

Court Reporter:      JANICE I. PAYNE, CSMR 3521

                      (313) 224-2487

AUG 1 2 2004

APPELLATE DEFENDER OFFICE

Processed
Notice of Filing Sent
B. Maurice
Clerk

1  (By Mr. Hall)

2  Q  Could you read the statement that Mr. Craighead gave to

3     you?

4  A  Yes.

5           Question:  "What can you tell me

6        about the fatal shooting of Mr. Chole Pruett?"

7           Answer:  "I was over to Chole's

8        apartment.  It was just me and Chole.  We got into

9        an argument.  I can't recall what the argument was

10       about.  Choie had a gun.  We got to fighting over

11       the gun.  I got the gun away from Chole.  I

12       panicked and I fired the gun.  After Chole was

13       shot, I didn't know what to do.  I ran out of the

14       apartment.  I went home.  I was scared.  I didn't

15       know what to do."

16          Question:  "Mr. Craighead, when you

17       left Mr. Pruett's apartment, did you take

is       anything?"

19          Answer:  "No."

20          Question:  "Mr. Craighead, did you

21       take Mr. Pruett's truck?"

22          Answer:  "Yes.  I drove it over to

23       Redford.  I don't remember what street I drove the

24       truck to."

25          Question:  "How long have you known

                          110

Mr. Pruett?"

Answer: "I have known Chole for about four or five years. He was going with my sister-in-law, Samantha."

Question: "Have you and Chole ever had a fight before?"

Answer: "No, never. We were close friends."

Question: "What happened to the gun?"

Answer: "I don't remember."

Question: "Mr. Craighead, did I threaten you in any way to make a statement?"

Answer: "No;" and he signed his name "Mark Craighead."

Question: "Mr. Craighead, did I promise you anything to make a statement or answer any questions?"

Answer: "No;" and he signed his name "Mark Craighead."

Question: "Mr. Craighead, were you deprived of food or the use of the restroom?"

Answer: "No;" and he signed his name "Mark Craighead."

Question: "Mr. Craighead, are you

.111

1    on any type of medication?"

2              Answer:  "No;" and he signed his

3    name "Mark Craighead."

4              Question:  "Mr. Craighead, is the

5    statement you gave and the questions you answered

6    true?"

7              Answer:  "Yes;" and he signed his

8    name "Mark Craighead."  Then he signed his name

9    "Mark Craighead," and put the date 6/21/2000; the

10    time 11:50 a.m.

11   Q    Do you know when Mr. Craighead was brought down to --

12        I'm sorry, strike that.

13              Where were you when you interviewed Mr.

14    Craighead?

15   A    Homicide, fifth floor, Squad 7, I believe.

16   Q    Do.you know when he was brought to that location?

17   A    I think the first time I seen him was on the 20th.

18   Q    Did you have any contact with him prior to him giving

19        that statement?

20   A    Yes.

21   Q    Did you interview him prior to giving that statement?

22   A    No.

23   Q    So your contact with him wasn't in relation to talking

24        to him about anything regarding the case?

25   A    No, not at that time.

112

**APPENDIX B**

<table>
<tr><td>STATE OF MICHIGAN<br>Third Judicial Circuit Court<br>Criminal Division</td><td>ORDER<br>DENYING / GRANTING<br>MOTION</td><td>Case No.<br>00-7900</td></tr>
</table>

**THE PEOPLE OF THE STATE OF MICHIGAN**

       vs.

Mark Craighead
Defendant

At a Session of Said Court held in The Frank Murphy Hall of Justice

at Detroit in Wayne County on    5-17-05

**PRESENT:** Honorable  Vera Massey Jones
Judge

A Motion for :  new trial     having been filed; and

---

the People having filed and answer in opposition; and the Court having reviewed the briefs and records in the Cause and

being fully advised in the premises;

**IT IS ORDERED THAT** the Motion for _____

_____ be and

is hereby  [✓] denied  [ ] granted.

_____<br>Judge

A TRUE COPY
CATHY M. GARRETT
WAYNE COUNTY CLERK
BY_____
DEPUTY CLERK

**ORDER DENYING / GRANTING MOTION**

FORM #7 ( 12 / 97)

**APPENDIX C**

*20935t*

RECEIVED

JUL 2 5 2005

APPELLATE DEFENDER OFFICE

# STATE OF MICHIGAN

## IN THE WAYNE COUNTY CIRCUIT COURT

**PEOPLE OF THE STATE OF MICHIGAN,**

Plaintiff-Appellee,

-vs-

**MARK TALBORT CRAIGHEAD,**

Defendant-Appellant.

_____/

Court of Appeals No. 243856
Circuit Court No. 00-7900-01

**Honorable Vera Massey Jones**

### PRAECIPE FOR MOTION AND ORDER/JUDGMENT

TO THE ASSIGNMENT CLERK:  Please place Defendant's

**MOTION FOR RECONSIDERATION AND/OR TO AMEND MOTION FOR NEW TRIAL**

On the motion calendar for **hearing on the pleadings.**  This motion is to be heard by JUDGE VERA MASSEY JONES.

TO COURT CLERK:  Have the following Order/Judgment completed and signed by Judge and check 1 or 2 below, whichever is applicable.

### ORDER/JUDGMENT

DATED:  **6-27-05**

1.    IT IS HEREBY ORDERED THAT the aforesaid motion be and the same is hereby
____✓___ DENIED/_____ GRANTED, and it is FURTHER ORDERED AND ADJUDGED

Honorable Vera Massey Jones
Wayne County Circuit Court Judge

Date:  **6-27-05**

### APPROVED AS TO FORM AND SUBSTANCE BY COUNSEL FOR:

**VALERIE NEWMAN (P 47291)**
Defendant's Attorney
Telephone No. (313) 256-9833

WAYNE COUNTY PROSECUTOR
Plaintiff's Attorney

Telephone No.

DATE::

Receipt Acknowledge of above

By_____

Date_____
Court of Appeals Detroit Office

**APPENDIX D**

June 5, 2002

Ms. Ruth Carter
Corporation Counsel
City of Detroit
660 Woodward Avenue, Suite 1650
Detroit, MI 48226-3491

Re: Investigation of the Detroit Police Department

Dear Ms. Carter:

As you know, the Civil Rights Division and the United States Attorney's Office for the Eastern District of Michigan are jointly conducting an investigation of the Detroit Police Department (DPD), pursuant to the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141. We greatly appreciate the cooperation of the City of Detroit and the DPD thus far in this investigation.

Our investigation covers three areas: Use of force policies and practices of the DPD; DPD holding cell conditions, policies and practices; and DPD arrest and detention policies and practices. We identified our preliminary concerns regarding the use of force policies and practices of the DPD in our letter of March 6, 2002. We identified our concerns regarding DPD holding cells in a letter regarding emergent conditions on April 25, 2001, and provided more extensive comments and technical assistance recommendations regarding DPD holding cell conditions, policies and practices in our April 4, 2002 letter.

In this letter, we identify several areas of concern regarding DPD arrest and detention policies and practices, along with our recommendations for addressing these concerns. Important aspects of our fact-gathering process have yet to be completed, most notably completing our review of relevant DPD documents. Therefore, this letter is not meant to be exhaustive, but rather focuses on significant concerns identified in our review of the DPD's policies and procedures, a preliminary review of the documents that the DPD has produced and interviews with over 100 DPD employees. Please note that we may identify additional issues, and that the concerns discussed below do not relate to the use of force and holding cell components of our investigation.

## I. Background

In March of 2000, former United States Attorney Saul Green met with former DPD Chief Benny Napoleon, other DPD command-level staff and supervisors from federal law enforcement agencies to discuss DPD arrest policies and procedures. The meeting was called because the United States Attorney's office had received reports of unconstitutional arrest and detention practices within the DPD homicide section. In response, the DPD agreed to end these arrest and detention practices and to institute a training program to ensure future compliance with constitutional mandates.

Our review to date raises concerns that the DPD may be (1) making warrantless arrests without probable cause; (2) arresting and detaining witnesses and family members of suspects without proper judicial authority; and (3) inappropriately delaying probable cause hearings before a judge or magistrate. Our interviews of DPD personnel indicate that, with the exception of Wayne County Prosecutors having spoken at a homicide roll call, the DPD has not instituted any policy changes or formal training program to address these concerns. We recognize that the new leadership in the DPD intends to address these issues.

As our investigation initially focused on the homicide section, the numbers presented in this letter reflect arrests and detentions in that section. Although arrest and detention concerns were identified throughout the DPD, the homicide section is one of the special commands where the arrest and witness detention concerns were most prevalent. The special commands include homicide as well as the other sections of the major crimes division and the narcotics bureau. The special commands are located in the First Precinct in the Headquarters Building. Individuals detained by the special commands were lodged, or housed, in the First Precinct until the cells were closed in September 2001. Special command detainees are now lodged in any precinct with available space. The closure of the cells in the First Precinct does not change our analysis as 1) the individual investigator in charge of a particular case and that investigator's supervisor continue to be responsible for the detainee irrespective of location, and 2) the DPD has not changed its problematic arrest and detention policies and practices.

## II. Arrest Policies and Practices

DPD arrest policies and procedures contain imprecise, ambiguous and contradictory language. The policies as written, coupled with a lack of supervision, allow for the unconstitutional arrest of witnesses and suspects.

### A. Arrest of witnesses

We recommend that the DPD amend and clarify its policies to comply with the law governing arrest. An arrest occurs when an officer's words or actions would convey to a reasonable person that he or she is not free to leave. [1] California v. Hodari D., 499 U.S. 621, 628 (1991). Therefore, an officer's subjective intent is not a factor in the evaluation. This inquiry is based on all of the circumstances surrounding the encounter. Florida v. Bostick, 501 U.S. 429, 437 (1991). Thus, an individual may be under arrest whether uncuffed on the street, guarded by officers in a special command or locked in a precinct holding cell, so long as a reasonable person would conclude that he or she is not free to leave.

According to DPD policy an arrest is defined "as a taking of an individual into custody for further investigation, booking or prosecution." [2] Under DPD policy, "an arrest is not valid unless the arresting officer actually has the intent to make an arrest according to the definition of 'arrest'." [3] DPD policy further states that witnesses should be detained at the scene of a crime investigation and/or transported to the Headquarters Building for interviewing. [4] These policies implicitly authorize DPD employees to detain witnesses involuntarily for questioning. Some DPD employees, who acknowledge that witnesses are detained involuntarily for questioning, stated that even though a witness is not free to refuse transport to or leave from the command, they do not consider the witness to be under arrest.

We recommend that the DPD revise and clarify its investigative policies and eliminate any authorization or instruction to detain witnesses, absent a valid material witness order. [5] We further recommend that the DPD utilize appropriate law enforcement procedures that include techniques for both on-scene and station house interviews of witnesses. The procedures must safeguard voluntary participation by witnesses.

The new policies and procedures should be circulated to all precincts and commands. The DPD Manual should be updated to reflect the changes. The DPD should provide training on the new policies and procedures to all levels of command. All training should be documented to clearly identify who was trained, the date they were trained, and how the training was conducted. Finally, audits should be conducted to ensure compliance with the new procedures.

## B. Arrest of suspects

The DPD does not adequately define arrest or probable cause, although DPD policy correctly states that probable cause is required for an arrest.[6] As previously mentioned, the DPD defines an arrest as "a taking of an individual into custody for further investigation, booking, or prosecution."[7] This policy implicitly permits the arrest of an individual with less than probable cause as a means to facilitate an investigation. Indeed, some former DPD employees informed us that it was acceptable practice to arrest suspects without probable cause and then continue to investigate the case to develop probable cause prior to arraignment. Gathering additional evidence after an arrest in order to establish probable cause for that arrest is unconstitutional. County of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991).

Furthermore, DPD policy states that "a very substantial possibility that the person to be arrested has committed a crime" is sufficient for probable cause.[8] This is problematic because it does not set an objective standard. Probable cause requires the officer have information "sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." Michigan v. DeFillippo, 443 U.S. 31, (1979) (citations omitted). DPD policy also implicitly sets a lower standard by referring to the possibility that a crime was committed, rather than a probability.

Within any given police department there will be examples of individuals who are arrested and then discharged from police custody without being charged with a crime. However, the large number of individuals arrested and later discharged by the DPD indicates that arrests may have been made without probable cause. The 1998 FBI Uniform Crime Report revealed that in 1998 the DPD arrested three times as many individuals for homicides as the number of homicides in the City of Detroit. In that same year, the DPD solved only 47% of it's homicide cases. This trend continued in 1999 and 2000.[9]

While more than one person may be involved in a homicide, which could increase the number of arrests per homicide, our preliminary document review indicates that this does not explain this discrepancy. For example, in one month in 2001, 76 individuals were arrested and initially charged with homicide.[10] Of the 76, only 30% were formally charged with homicide. Of the 53 individuals not formally charged with homicide, 23% were held for over 48 hours, one for 91 hours, or almost four days.

DPD employees informed us that a suspect may be discharged from police custody if probable cause is not attained within a reasonable period of time after the arrest.[11] If and when probable cause is attained, the suspect may be re-arrested. As discussed above, arresting individuals without probable cause and then investigating to obtain probable cause is not constitutional. Other DPD employees revealed that some suspects are not actually released from the precinct for lack of probable cause, but instead are removed from the holding cell and taken into another area of the precinct while the investigator completes new arrest documentation indicating a new arrest date and time and returns the individual to the holding cell, with no apparent additional basis for an arrest.

Two DPD policies that require supervisory review of probable cause are not being applied to the special commands in the Headquarters Building. The first requires the Officer-in-Charge (OIC) of the precinct station desk to review the circumstances of each arrest.[12] The second requires each precinct commanding officer to review the details of the case for every individual lodged and later discharged.[13] Although DPD employees informed us that the supervisors in the special commands were expected to know who was arrested, on what case, and for what reason, this review process was not routinized or documented in the special commands.

We recommend that the DPD amend and clarify its definition of probable cause. The DPD should revise and clarify its arrest policies to eliminate any reference to an arrest as an investigative tool.

We recommend that the DPD ensure that the policies requiring supervisory review of probable cause are applied to the special commands. The consistent application of existing DPD policies will require a supervisory and precinct review of probable cause when a detainee is lodged by an investigator in a special command. Furthermore, the case file should clearly indicate every individual arrested in the course of an investigation by name, address, probable cause statement, date of arrest, date of discharge, arresting officer and supervisor approving the detention.

The new policies and procedures should be circulated to all precincts and commands. The DPD should provide training on the new policies and procedures to all levels of command. All training should be documented to clearly identify who was trained, the date they were trained, and how the training was conducted. Finally, audits should be conducted to ensure compliance with the new procedures.

## III.  Detention Policies and Practices

When a detainee is arrested, the DPD requires that the detainee be formally processed before being placed in a precinct holding cell. As part of the processing procedure, DPD policy requires that an arrest ticket be completed. An arrest ticket records an individual's personal information as well as the charge on which he/she is lodged, or detained in a holding cell. If the individual is a police witness, the investigator is required to identify that information on the arrest ticket and to attach the court order authorizing the witness' detention to the arrest ticket.

The DPD does not ensure that detainees are moved out of its custody in a systematic and timely manner. The lack of a systematic process permits the unconstitutional detention of individuals in DPD custody. The DPD precinct cells were designed and are intended to operate as temporary holding facilities. Regardless of a detainee's destination, [14] the DPD needs to implement a system that will process all detainees and ensure their timely movement out of DPD custody.

### A.  Individuals lodged as police witnesses

A witness who is subpoenaed to testify in a criminal case is a material witness. Pursuant to the U.S. Constitution and Michigan Law, only a court has the authority to decide whether an individual is a material witness and whether that material witness should be committed to a jail pending his/her testimony. [15] DPD policies regarding material witnesses are inconsistent. Although the DPD does not identify material witnesses as such, the DPD describes four categories of police witnesses, all of whom are detained to ensure their testimony in a criminal case [16] and all of whom require a court order prior to their detention in a precinct cell. [17] This policy also states that the DPD does not have the authority to detain a police witness without a court order for more than 12 hours. [18] The policy implies that an eleven hour detention without a court order is acceptable. Yet another DPD policy specifically requires DPD detention officers to check the admission cards of all police witnesses on a daily basis and to contact the OIC regarding the lack of a court order or expected date of release. [19] These inconsistencies in DPD policies implicitly allow for the illegal detention of individuals classified as police witnesses.

DPD employees have informed us that individuals merely suspected of being a witness or merely suspected of knowing the whereabouts of a suspect are arrested, lodged and held as police witnesses in precinct cells without a court order or access to judicial review. However, even if the DPD enforced its policy requiring a court order to arrest or detain police witnesses, individuals would remain improperly

detained in DPD custody because not all witnesses are classified as witnesses when they are arrested. Indeed, DPD employees informed us that some witnesses are listed as being charged with the crime with which they are believed to have information.

Some witnesses are appropriately classified as police witnesses and lodged pursuant to a court order. We spoke to several such police witnesses who were sentenced prisoners removed from a state correctional facility. The police witnesses we spoke to had been in the holding cells for several months even though DPD facilities are designed and operated for temporary placement only.

We recommend that the DPD revise its policies regarding police witnesses to eliminate conflicting elements and to comply with the U.S. Constitution and Michigan Law. The DPD should not allow any individual classified as a police witness to be lodged without a court order. If an investigator does not have a court order, the OIC of the precinct desk should refuse to lodge the witness. Similarly, if a witness without a court order is detained at a special command, the investigator's supervisor should ensure that the individual is immediately released.

The DPD should arrange for any police witness held for an extended period of time to be lodged in a facility designed for extended stays.

B.  Individuals charged with a crime

Judicial review of a warrantless arrest is required as soon as is reasonably feasible.[20] DPD policy requires DPD employees to obtain judicial review of a warrantless arrest "within the time period required by law" or "within a reasonable period of time".[21] Despite this written policy, several DPD employees informed us that they have 48 hours from the time of arrest to seek judicial review as a matter of course. Some DPD employees stated that they used the 48 hour period to investigate for probable cause and/or to seek a statement from the detainee. Some DPD employees stated that they were allowed 72 hours if an individual was charged with a felony. During our February 2002 tour, we were informed by a DPD employee that a woman recently had been detained at the 12th precinct for five days before presentment for judicial review.

DPD employees have informed us that after an arrest, the arresting officer completes the necessary paper work including a warrant request. The submission of a warrant request to the precinct's court liaison begins the arraignment process. Each day, the court liaison files the requests with the prosecutor's office, who in turn schedules the detainee for arraignment. In a case involving a special command, the arresting officer does not submit the warrant request because the case is turned over to an investigator in a special command. The assigned investigator determines when to submit the warrant request and may delay this process to interview the detainee or conduct other additional investigation. DPD employees cite investigator unavailability as the primary cause for delay in the arraignment process.

DPD Special Order 95-47 attempts to create a system to ensure a timely arraignment by requiring notification and responsibility at multiple levels of command. The Special Order states that it is the responsibility of the investigator in charge of the case or the investigator's supervisor to ensure that a detainee is arraigned within the "time period required by law." If a detainee is not arraigned within 24 hours, the policy requires that "the command holding the detainee" notify the deputy chief or an executive duty officer. Upon executive review, if permission to hold the detainee beyond 24 hours is granted, the arrest ticket is to be marked accordingly and an inter-office memo is to be sent to the affected deputy chief. The Special Order requires deputy chiefs to prepare a monthly report to the chief "detailing the circumstance of detainees held over 24 hours." Our preliminary document review reveals no notations indicating executive review of arrest tickets of individuals detained over 24 hours.

Interviews with DPD employees confirm that the policy is not practiced.

Prior to the closing of the holding cells in the First Precinct, DPD detention officers at that facility were required to record all detainees held for 36 hours or more.[22] However, the policy only authorized the OIC to contact the investigator in charge of the case or the investigator's supervisor, notify him or her that the detainee had been in custody for 36 hours or more and record the notification. The OIC was not authorized to send the detainee to court or release the detainee if an investigator was in charge of the case, although the OIC did have this authority if a non-investigator was the officer in charge of the case. The policy also required a written authorization for prisoners held over 48 hours by the commanding officer of the unit responsible for the prisoner. Our preliminary document review reveals no notations indicating executive review of individuals detained over 48 hours. Interviews with DPD employees further confirm that it is not uncommon for DPD detainees to be held over 48 hours. Similarly, our preliminary document review revealed that in one month in 2001, of the 83 individuals either detained on a charge of homicide or as a police witness without a writ, 29% were detained for more than 48 hours.

We recommend that the DPD examine its policies and repeal or amend policies that are fully or partially in conflict with the U.S. Constitution and Michigan Law. The DPD should circulate the revised policies, provide training to all affected levels of command, and document the training of DPD employees as described in Section 2(B) above. Audits should be conducted to ensure compliance with the new procedures.

We recommend that the DPD develop a routine and systematic process to ensure that a detainee will be presented for judicial review as required by the U.S. Constitution and Michigan Law. The process should be triggered when an individual is lodged in a precinct and proceed independent of an investigator's oversight. An investigator's unavailability should not affect the detainee's arraignment process.[23]

If a detainee's arraignment does not occur as part of this systematic process, DPD policy should designate the individual responsible for contacting the investigator's supervisor regarding this delay. Upon notification, the supervisor should be required to submit a written review of the detention, specifying the probable cause for the arrest, the reasons for the delay in arraignment and the steps identified to ensure imminent arraignment. If the supervisor's investigation reveals that the detainee's arraignment was delayed without good cause, the supervisor should authorize the detainee's release. This entire process should be documented and contained in the case file.

C. Holds

An arrest ticket is prepared for every detainee lodged in a precinct cell. The arrest ticket records an individual's personal information as well as a criminal charge. There is a separate arrest ticket for each charge. An arrest ticket marked with a "hold" indicates that a detainee should not be released if the charge on the particular arrest ticket is resolved, as the detainee has additional pending charges.

Pursuant to DPD policy,[24] individuals detained by special commands are not permitted to clear outstanding warrants or holds until arraignment or discharge by the special command. Our preliminary document review reveals that in one month in 2000, several individuals with outstanding traffic warrants were held by a special command for several days before being released by the special command. The DPD should not prevent a detainee from clearing a traffic warrant while using the existence of the traffic warrant to justify an individual's continued detention.

We recommend that the DPD amend its warrant policy. All detainees with warrants should be presented to the court where the warrant was lodged in a routine and timely manner. The interest or charge of a special command should not affect the time frame in which the warrant is vacated. A legitimate material witness order will serve to hold a detainee for a special command after the traffic warrant is vacated.

## D. Restrictions

The DPD does not have a policy that identifies appropriate circumstances for restricting an individual's telephone or visiting privileges. An investigator is able to deny telephone and visitation privileges to a witness or a suspect in a precinct holding cell without a documented explanation or review of the decision. The investigator need only relay the name of the individual and the type of restrictions to a detention officer who recorded the restrictions in a log book.[25] Some DPD employees informed us that a detainee with telephone restrictions would not be permitted to telephone an attorney.

We recommend that the DPD develop policies that do not unreasonably restrict a detainee's access to telephone calls or visitors. Although the DPD may identify special circumstances that require reasonable restrictions, the policy should: 1) identify the circumstances that permit a restriction; 2) require a written record; and 3) be subject to review. Copies should be kept at the precinct of detention and in the case file. The policy also should clearly articulate that it does not prevent a detainee from communication with an attorney.

## E. Record Keeping

DPD arrest and detention record-keeping practices are insufficient. Without accurate record-keeping, the DPD cannot review the status of detainees held in DPD custody to determine the basis or length of detention. Poor record-keeping also makes oversight of the arrest and detention process difficult.

DPD policy requires that each detention be recorded on three separate documents, the arrest ticket, the log book/desk blotter and the computerized data base.[26] Prior to its closing, the First Precinct was required to maintain a fourth record for each detainee, a prisoner admission card.

In one month in 2001, we found that of the 94 persons arrested and charged with a homicide[27] or as a police witness in connection with a homicide: 26% had no arrest tickets; 35% had no prisoner admission cards; 8% were never entered in the database; and 48% did not appear in the log book. Arrest tickets frequently did not have all of the required information completed, such as the "Initial Charge" or "Final Charge" or the date and time a particular detainee was discharged or turned over to another agency. As a result, there is no log or data base that accurately reflects each individual arrested by the DPD.

We recommend that the DPD develop a system which ensures the complete and uniform documentation of each person held in DPD custody. The system should allow the DPD to evaluate the detainee population in terms of length of detention, timely presentment to a judicial officer and ratio of arrests to judicial findings of probable cause. We also recommend that the DPD develop an audit process which regularly evaluates detainee documentation for accuracy and completion.

Thank you again for the continued cooperation of the Law Department and the DPD. We look forward to working with you and the DPD.

Sincerely,

Steven H. Rosenbaum
Chief
Special Litigation Section

Jeffrey G. Collins
United States Attorney
Eastern District of Michigan

cc: The Honorable Kwame M. Kilpatrick
    Chief Jerry A. Oliver, Sr.

---

1. A brief investigatory stop based upon reasonably articulable suspicion is not an arrest. Terry v. Ohio, 392 U.S. 1, 21 (1968).

2. Detroit Police Department General Procedures(GP), Volume III, Chapter 9, Section 7.

3. GP, Volume III, Chapter 1, Section 8.2. DPD policy does seem to recognize that there is an objective standard for an arrest in a limited context. Specifically, DPD policy states that a court may find that a Terry stop has become an arrest if an individual has been detained for an undue length of time (the policy recommends no more than 20 minutes) or if an individual is transported to another location. GP Volume III, Chapter 1, Section 4.7. However, this provision only addresses when a Terry stop becomes an arrest, not the more generalized question of when an arrest has occurred.

4. GP, Volume III, Chapter 9, Sections 1, 3.2, 5.1(f) and 8.

5. The detention of material witnesses will be discussed in Section III(A) below.

6. GP, Volume III, Chapter 1, Section 16.1.

7. GP, Volume III, Chapter 1, Section 7.

8. GP, Volume III, Chapter 1, Section 16.2.

9. 1998 FBI Uniform Crime Report indicates that the DPD reported 1,310 homicide arrests but only 430 homicide cases. Similarly, the Michigan State Police Uniform Crime Report indicates that in 1999, the DPD reported 1,152 homicide arrests for 415 homicides and in 2000, the DPD reported 1,217 homicide arrests for 396 homicides.

10. The initial charge is the charge for which the DPD officer indicates the individual is being detained. A final, or formal charge, is the charge sought by the DPD on a warrant presented to a judicial officer.

11. One DPD employee claimed that the additional arrest tickets caused by the temporary release and re-arrest of homicide suspects explains the unusually high number of homicide arrests reflected in the FBI Uniform Crime Report. This does not account for the large discrepancy and raises concerns that arrests are being made without probable cause, as discussed above.

12. GP, Volume III, Chapter 2, Section 1.

13. GP, Volume III, Chapter 2, Section 106.

14. Detainees may be arraigned, released, sent to a specific court to have a warrant vacated or lodged at another facility.

15. MCL § 767.35.

16. "1. Hostile Witness: A hostile is a non-involved eye witness to a crime but refuses to testify when subpoenaed.

2. Protective Custody Witness: This classification of witness is a person who comes forth to testify but requests protective police custody because of life-threatening circumstances.

3. Co-defendant Witness: A co-defendant witness is a person charged with a crime awaiting trial or sentence on one case and declares himself a witness to another case.

4. Declared Witness: A declared witness is a person charged with a crime awaiting trial or sentence on one case and declares himself a witness to another case." Detroit Police Department Standard Operating Procedure (SOP) S-100.

17. "A prisoner classified as a police witness will not be detained in our custody unless said witness is committed by authority of an Affidavit For Order Detaining Prisoner/Material Witness document signed by a 36[th] District or Recorder's Court judge." SOP S-100(I)(B)(4).

18. Id at (II)(E)(1).

19. SOP C-300.

20. County of Riverside v. McLaughlin, supra.

21. DPD Legal Advisor Update 01-01 issued March 22, 2001 and DPD Legal Advisor Update 92-02 issued May 15, 1992. Although the Legal Advisor Updates state that it is unreasonable to delay judicial review for the purpose of gathering additional evidence to justify the arrest, the DPD did not change its definition of arrest or clarify its arrest policies. See discussion in Section II(B) above.

22. SOP C-301.

23. Delaying arraignment for investigative purposes violates the Supreme Court's ruling in Riverside, supra.

24. GP, Volume III, Chapter 2, Section 19.4/19.5.

25. The log book was the practice in the now-closed First Precinct cells; we are unclear as to the practice in the precincts.

26. The data base generates a unique central booking number for each charge lodged against a detainee.

27. The number of individuals charged with homicide is the sum of individuals charged with murder, homicide and manslaughter.

**APPENDIX E**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,              )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )      No.      03-72258
                                       )
CITY OF DETROIT, MICHIGAN              )      HON.     Julian Abele Cook
and the DETROIT POLICE                 )
DEPARTMENT,                            )
                                       )
            Defendants.                )
_____)

### Consent Judgement
### Use of Force and Arrest and Witness Detention

### Table of Contents

I.      DEFINITIONS............................................  1

II.     GENERAL PROVISIONS....................................  5

III.    USE OF FORCE POLICY...................................  7
        A.    *General Use of Force Policies*.................  7
        B.    *Use of Firearms Policy*........................  8
        C.    *Intermediate Force Device Policy*..............  8
        D.    *Chemical Spray Policy*.........................  9

IV.     INCIDENT DOCUMENTATION, INVESTIGATION, AND REVIEW.....  9
        A.    *General Investigations of Police Action*.......  9
        B.    *Use of Force and Prisoner Injury Investigations*... 12
        C.    *Review of Critical Firearm Discharges and* ...... 13
              *In-Custody Deaths*

V.      ARREST AND DETENTION POLICIES AND PRACTICES........... 14
        A.    *Arrest Policies*............................... 14
        B.    *Investigatory Stop Policies*................... 14
        C.    *Witness Identification and Questioning Policies*... 14
        D.    *Prompt Judicial Review Policies*............... 15
        E.    *Hold Policies*................................. 16
        F.    *Restriction Policies*.......................... 16
        G.    *Material Witness Policies*..................... 16
        H.    *Documentation of Custodial Detention*.......... 17
        I.    *Command Notification*.......................... 17

VI.   EXTERNAL COMPLAINTS.................................. 17
      A.   Intake and Tracking............................ 18
      B.   External Complaint Investigation............... 19

VII.  GENERAL POLICIES.................................... 20

VIII. MANAGEMENT AND SUPERVISION.......................... 22
      A.   Risk Management Database....................... 22
      B.   Performance Evaluation System.................. 28
      C.   Oversight...................................... 28
      D.   Use of Video Cameras........................... 29
      E.   Discipline..................................... 30

IX.   TRAINING............................................ 30
      A.   Oversight and Development...................... 30
      B.   Use of Force Training.......................... 32
      C.   Firearms Training.............................. 33
      D.   Arrest and Police-Citizen Interaction Training.... 33
      E.   Custodial Detention Training................... 34
      F.   Supervisory Training........................... 34
      G.   Investigator Training.......................... 35
      H.   Field Training................................. 35

X.    MONITORING, REPORTING, AND IMPLEMENTATION........... 35
      A.   Selection of the Monitor....................... 35
      B.   Duties of the Monitor.......................... 37
      C.   Compliance Reviews............................. 39
      D.   Reports and Records............................ 40
      E.   Implementation, Termination, and Enforcement...... 41
      F.   Miscellaneous.................................. 42

## I.   DEFINITIONS

1.   As used in this Agreement:

a.   The term "actively resisting" means the subject is making physically evasive movements to defeat an officer's attempt at control, including bracing, tensing, pulling away, or pushing.

b.   The term "arrest" means a seizure of greater scope or duration than an investigatory or Terry stop.  An arrest is lawful when supported by probable cause.

c.   The term "auditable form" or "auditable log" means a discrete record of the relevant information maintained separate and independent of blotters and other forms maintained by the DPD.

d.   The term "canine apprehension" means any time a canine is deployed and plays a clear and well-documented role in the capture of a person.  The mere presence of a canine at the scene of an arrest shall not be counted as an apprehension.

e.   The term "canine bite ratio" means the number of apprehensions accomplished by means of a dog bite divided by the total number of apprehensions (both with and without a bite).

f.   The term "canine deployment" means any situation, except in cases involving an on-leash article search only, in which a canine is brought to the scene and either:  i) the canine is released from the police car in furtherance of the police action; or ii) the suspect gives up immediately after an announcement is made that if he/she does not surrender the canine will be released.

g.   The term "City" means the City of Detroit, including its agents, officers and employees.

h. ,  The term "Collective Bargaining Agreements" means the labor agreements by and between the City and the Detroit Police Officers Association, the Detroit Police Lieutenants and Sergeants Association, the Detroit Police Command Officers Association, the Police Officer Labor Council, and Local 2394 of the American Federation of State, County, and Municipal Employees in effect on the effective date of this Agreement.

1

i. The term "command investigation" means an investigation conducted by a DPD officer's or employee's supervisor.

j. The term "complaint" means an allegation from any source of any misconduct by DPD personnel.

k. The term "conveyance" means any instance when the DPD transports a non-DPD employee for any purpose.

l. The term "critical firearm discharge" means each discharge of a firearm by a DPD officer with the exception of range and training discharges and discharges at animals.

m. The term "DOJ" means the United States Department of Justice and its agents and employees.

n. The term "DPD" means the Detroit Police Department, its agents and its employees (both sworn and unsworn).

o. The term "DPD unit" means any officially designated organization of officers within the DPD, including precincts and specialized units.

p. The term "discipline" means a written reprimand, suspension, demotion or dismissal.

q. The term "effective date" means the day this Agreement is entered by the Court.

r. The term "escorting" means the use of light physical pressure to guide a person, or keep a person in place.

s. The term "FTO" means a field training officer.

t. The term "force" means the following actions by an officer: any physical strike or instrumental contact with a person; any intentional attempted physical strike or instrumental contact that does not take effect; or any significant physical contact that restricts the movement of a person. The term includes the discharge of firearms; the use of chemical spray, choke holds or hard hands; the taking of a subject to the ground; or the deployment of a canine. The term does not include escorting or handcuffing a person,

2

with no or minimal resistance. Use of force is lawful if it is objectively reasonable under the circumstances and the minimum amount of force necessary to effect an arrest or protect the officer or other person.

u. The term "hard hands" means using physical pressure to force a person against an object or the ground, or the use of physical strength or skill that causes pain or leaves a mark.

v. The term "hold" means any outstanding charge(s) or warrant(s) other than those which serve as the predicate for the current arrest.

w. The term "IAD" means the section of the DPD that investigates serious uses of force and allegations of criminal misconduct by DPD employees.

x. The term "including" means "including, but not limited to."

y. The term "injury" means any impairment of physical condition or pain.

z. The term "investigatory stop," or "<u>Terry</u> stop," means a limited seizure. An investigatory stop is lawful when supported by reasonable suspicion and narrowly tailored in scope and duration to the reasons supporting the seizure.

aa. The term "material witness" means a witness subpoenaed to testify in a criminal case.

bb. The term "misconduct" means any conduct by a DPD employee that violates DPD policy or the law.

cc. The term "non-disciplinary corrective action" means counseling, training or other action apart from discipline taken by a DPD supervisor to enable or encourage an officer to modify or improve his or her performance.

dd. The term "OCI" means the Office of the Chief Investigator, which has responsibility for investigating external complaints.

ee. The term "parties" means the DOJ, the City and the DPD.

ff. The term "police officer" or "officer" means any law

3

enforcement officer employed by the DPD, including supervisors.

gg. The term "prisoner injury" means an injury, or complaint of injury, that occurs in the course of taking or after an individual was taken into DPD custody that is not attributed to a use of force by a DPD employee.

hh. The term "probable cause" means a reasonable belief that an individual has committed, is committing, or is about to commit an offense.

ii. The term "prompt judicial review" means the presentment of an arrestee before a court of appropriate jurisdiction for a probable cause determination as soon after an arrest as is reasonably feasible. A reasonably feasible time period is the period of time necessary to schedule the arraignment and complete the administrative processing of the arrestee and shall not exceed 48 hours of the arrest, absent extraordinary circumstances.

jj. The term "proper use of force decision making" means the use of reasonable force, including proper tactics, and de-escalation techniques.

kk. The term "reasonable suspicion" means the specific facts and reasonable inferences drawn from those facts to convince an ordinarily prudent person that criminality is at hand.

ll. The term "seizure," or "detention," means any restriction on the liberty interest of an individual. A seizure occurs when an officer's words or actions convey to a reasonable person that he or she is not free to leave.

mm. The term "serious bodily injury" means an injury that involves a loss of consciousness, extreme physical pain, protracted and obvious disfigurement, protracted loss or impairment of the function of a body part or organ, or a substantial risk of death.

nn. The term "serious use of force" means any action by a DPD officer that involves: i) the use of deadly force, including all critical firearms discharges; ii) a use of force in which the person suffers serious bodily injury or requires hospital admission; iii) a canine bite; and iv) the

4

use of chemical spray against a restrained person.

oo.  The term "shall" means that the provision imposes a mandatory duty.

pp.  The term "supervisor" means a sworn DPD employee at the rank of sergeant or above and non-sworn employees with oversight responsibility for DPD employees.

## II.  GENERAL PROVISIONS

2.  This Agreement is effectuated pursuant to the authority granted the DOJ under the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141"), to seek declaratory or equitable relief to remedy a pattern or practice of conduct by law enforcement officers that deprives individuals of rights, privileges or immunities secured by the Constitution or federal law.

3.  In its Complaint, the United States alleges that the City and the DPD are engaging in a pattern or practice of unconstitutional or otherwise unlawful conduct that has been made possible by the failure of the City and the DPD to adopt and implement proper management practices and procedures.

4.  This Court has jurisdiction of this action under 28 U.S.C. §§ 1331 and 1345.  Venue is proper in the Eastern District of Michigan pursuant to 28 U.S.C. § 1391.

5.  This Agreement resolves all claims in the United States' Complaint filed in this case concerning allegations of a pattern or practice of conduct resulting in unconstitutional or otherwise unlawful uses of force and arrest and detention practices by the DPD in violation of 42 U.S.C. § 14141.  The DOJ, the City and the DPD have resolved the DOJ's claims regarding the conditions of confinement in DPD holding cells in a separate Agreement, to be filed concurrently with this Complaint and Agreement with the United States District Court for the Eastern District of Michigan.

6.  In September 2000, the Mayor of Detroit and other interested persons requested that the DOJ review the DPD's use of force.  This request indicated the City's commitment to minimizing the risk of excessive use of force in the DPD and to promoting police integrity.  Based, in part, on these

5

requests, the DOJ initiated an investigation in December 2000, of the use of force and conditions in DPD holding cells pursuant to its authority under Section 14141. The investigation was expanded in May 2001, to include the DPD's arrest and detention policies and practices.

7. DOJ's investigation was conducted with the full cooperation of the City. During the investigation, in keeping with the Attorney General's pledge to provide technical assistance, the DOJ made recommendations for changes in the DPD's policies and procedures regarding use of force, conditions in DPD holding cells, and arrest and detention in the form of three technical assistance letters of March 6, 2002, April 4, 2002 and June 5, 2002, several meetings with the Chief of Police and DPD command staff regarding the substance of the technical assistance letters, and participation in working groups created by the DPD to facilitate reform. The DPD is currently in the process of revising its policies and procedures to address the issues identified by the DOJ. The DOJ and the City believe this Agreement, rather than contested litigation, represents the best opportunity to address the DOJ's concerns.

8. Nothing in this Agreement is intended to alter the lawful authority of the DPD to use reasonable and necessary force, effect arrests and file charges, conduct searches or make seizures, or otherwise fulfill its law enforcement obligations in a manner consistent with the requirements of the Constitutions and laws of the United States and the State of Michigan.

9. Nothing in this Agreement is intended to alter the Collective Bargaining Agreements or impair the collective bargaining rights of employees under State and local law. Nothing in this Agreement is intended to amend or supercede any provision of State or local law, including the City Charter. The DOJ and the City have attempted to draft this Agreement to avoid impairing the rights of the Detroit Police Officers Association, the Detroit Police Lieutenants and Sergeants Association, the Detroit Police Command Officers Association, the Police Officer Labor Council, and Local 2394 of the American Federation of State, County, and Municipal Employees under the Collective Bargaining Agreements. However, a determination that any such right is impaired shall not excuse the City and the DPD from a failure to implement any provision of this Agreement.

6

10. This Agreement shall constitute the entire integrated agreement of the parties regarding use of force and arrest and detention practices. With the exception of the technical assistance letters described in paragraph 7, no prior drafts or prior or contemporaneous communications, oral or written, shall be relevant or admissible for purposes of determining the meaning of any provisions herein in any litigation or any other proceeding.

11. This Agreement is binding upon the parties, by and through their officials, agents, employees, and successors. The parties are interested in providing clear lines of authority: In the event of a dispute among officials, agents, employees, or agencies of the City, the Mayor of Detroit is the final authority on behalf of the City as it pertains to this Agreement. This Agreement is enforceable only by the parties. No person or entity is intended to be a third-party beneficiary of the provisions of this Agreement for purposes of any civil, criminal, or administrative action, and accordingly, no person or entity may assert any claim or right as a beneficiary or protected class under this Agreement. This Agreement is not intended to impair or expand the right of any person or organization to seek relief against the City or its officials, employees or agents for their conduct or the conduct of DPD officers; accordingly, it does not alter legal standards governing any such claims, including those under Michigan law. This Agreement does not authorize, nor shall it be construed to authorize, access to any City, DPD or DOJ documents by persons or entities other than the Court, the DOJ, the City, and the Monitor.

12. The City is responsible for providing necessary support to the DPD to enable it to fulfill its obligations under this Agreement.

13. The City, by and through its officials, agents, employees and successors, is enjoined from engaging in a pattern or practice of conduct by employees of the DPD that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

## III. USE OF FORCE POLICY

A. General Use of Force Policies

7

# V. ARREST AND DETENTION POLICIES AND PRACTICES

## A. Arrest Policies

42. The DPD shall revise its arrest policies to define arrest and probable cause as those terms are defined in this Agreement and prohibit the arrest of an individual with less than probable cause.

43. The DPD shall review all arrests for probable cause at the time the arrestee is presented at the precinct or specialized unit. This review shall be memorialized in writing within 12 hours of the arrest. For any arrest unsupported by probable cause or in which an arraignment warrant was not sought, the DPD shall document the circumstances of the arrest and/or the reasons the arraignment warrant was not sought on an auditable form within 12 hours of the event.

## B. Investigatory Stop Policies

44. The DPD shall revise its investigatory stop and frisk policies to define investigatory stop and reasonable suspicion as those terms are defined in this Agreement. The policy shall specify that a frisk is authorized only when the officer has reasonable suspicion to fear for his or her safety and that the scope of the frisk must be narrowly tailored to those specific reasons.

45. The DPD shall require written documentation of all investigatory stops and frisks by the end of the shift in which the police action occurred. The DPD shall review all investigatory stops and frisks and document on an auditable form those unsupported by reasonable suspicion within 24 hours of receiving the officer's report.

## C. Witness Identification and Questioning Policies

46. The DPD shall revise its witness identification and questioning policies to comply with the revised arrest and investigatory stop policies. The DPD shall prohibit the seizure of an individual without reasonable suspicion, probable cause or consent of the individual and require that the scope and duration of any seizure be narrowly tailored to the reasons supporting the police action. The DPD shall prohibit the conveyance of any individual to another location without reasonable suspicion, probable cause or

15

consent of the individual.

47. The DPD shall develop the revised witness identification and questioning policies within three months of the effective date of this Agreement. The revised policies shall be submitted for review and approval of the DOJ. The DPD shall implement the revised witness identification and questioning policies within three months of the review and approval of the DOJ.

48. The DPD shall document the content and circumstances of all interviews, interrogations and conveyances during the shift in which the police action occurred. The DPD shall review in writing all interviews, interrogations and conveyances and document on an auditable form those in violation of DPD policy within 12 hours of the interview, interrogation or conveyance.

D. Prompt Judicial Review Policies

49. The DPD shall revise its policies to require prompt judicial review, as defined in this Agreement, for every person arrested by the DPD. The DPD shall develop a timely and systematic process for all arrestees to be presented for prompt judicial review or to be released.

50. The DPD shall require that, for each arrestee, a warrant request for arraignment on the charges underlying the arrest is submitted to the prosecutor's office within 24 hours of the arrest.

51. The DPD shall document on an auditable form all instances in which the request for an arraignment warrant is submitted more than 24 hours after the arrest. The DPD shall also document on an auditable form all instances in which it is not in compliance with the prompt judicial review policy and in which extraordinary circumstances delayed the arraignment. The documentation shall occur by the end of the shift in which there was 1) a failure to request an arraignment warrant within 24 hours, 2) a failure to comply with the prompt judicial review policy, or 3) an arraignment delayed because of extraordinary circumstances.

E. Hold Policies

16

52. The DPD shall revise its hold policies to define a hold as that term is defined in this Agreement and require that all holds be documented. The policy shall establish a timely and systematic process for persons in DPD custody who have holds issued by a City of Detroit court to have those holds cleared by presenting the arrestee to the court from which the warrant was issued or the setting and posting of bond where applicable. The fact that an arrestee has not been arraigned or charged on the current arrest shall not delay this process.

53. The DPD shall document all holds, including the time each hold was identified and the time each hold was cleared. The DPD shall document on an auditable form each instance in which a hold is not processed within twenty-four hours on a daily basis.

F. Restriction Policies

54. The DPD shall develop a policy regarding restricting detainee's access to telephone calls and visitors that permits individuals in DPD custody access to attorneys and reasonable access to telephone calls and visitors.

55. The DPD shall require that such restrictions be documented and reviewed at the time the restriction is issued and reevaluated each day in which the restriction remains in effect. The DPD shall document on an auditable form any violation of the restriction policy by the end of the shift in which the violation occurred.

G. Material Witness Policies

56. The DPD shall revise its material witness policies to define material witness as that term is defined in this Agreement and remove the term "police witness" from DPD policies and procedures.

57. The DPD shall obtain a court order prior to taking a material witness into DPD custody. The DPD shall document on an auditable form the detention of each material witness and attach a copy of the court order authorizing the detention.

17

H. Documentation of Custodial Detention

58. The DPD shall revise its arrest and detention documentation to require, for all arrests, a record or file to contain accurate and auditable documentation of:

    a. the individual's personal information;
    b. the crime(s) charged;
    c. the time and date of arrest and release;
    d. the time and date the arraignment warrant was submitted;
    e. the name and badge number of the officer who submitted the arraignment warrant;
    f. the time and date of arraignment;
    g. the time and date each warrant was lodged and cleared, if applicable; and
    h. the individual's custodial status, e.g., new arrest, material witness or extradition.

I. Command Notification

59. The DPD shall require the commander of the precinct and, if applicable, of the specialized unit to review in writing all reported violations of DPD arrest, investigatory stop and frisk, witness identification and questioning policies and all reports of arrests in which an arraignment warrant was not sought. The commander's review shall be completed within 7 days of receiving the document reporting the event. The commander's review shall include an evaluation of the actions taken to correct the violation and whether any corrective or non-disciplinary action was taken.

60. The DPD shall require the commander of the precinct and, if applicable, of the specialized unit to review in writing all violations of DPD prompt judicial review, holds, restrictions and material witness policies on a daily basis. The commander's review shall include an evaluation of the actions taken to correct the violation and whether any corrective or non-disciplinary action was taken.

VI. EXTERNAL COMPLAINTS

61. The DPD and City shall revise their external complaint

18

pursuit;

    i.    the proper duration of a burst of chemical spray, the distance from which it should be applied, and emphasize that officers shall aim chemical spray only at the target's face and upper torso; and

    j.    consideration of the safety of civilians in the vicinity before engaging in police action.

C.   Firearms Training

113. The DPD shall develop a protocol regarding firearms training that:

    a.    ensures that all officers and supervisors complete the bi-annual firearms training and qualification;

    b.    incorporates professional night training, stress training (i.e., training in using a firearm after undergoing physical exertion) and proper use of force decision making training in the bi-annual in-service training program, with the goal of adequately preparing officers for real life situations;

    c.    ensures that firearm instructors critically observe students and provide corrective instruction regarding deficient firearm techniques and failure to utilize safe gun handling procedures at all times; and

    d.    incorporates evaluation criteria to determine satisfactory completion of recruit and in-service firearms training, including:

        i)   maintains finger off trigger unless justified and ready to fire;

        ii)  maintains proper hold of firearm and proper stance; and

        iii) uses proper use of force decision making.

D.   Arrest and Police-Citizen Interaction Training

114. The DPD shall provide all DPD recruits, officers and supervisors with annual training on arrests and other police-citizen interactions. Such training shall include and address the following topics:

    a.    the DPD arrest, investigatory stop and frisk and witness identification and questioning policies;

    b.    the Fourth Amendment and other constitutional

35

requirements, including:

   i)   advising officers that the "possibility" that an
        individual committed a crime does not rise to the
        level of probable cause;
   ii)  advising officers that the duration and scope of
        the police-citizen interaction determines whether
        an arrest occurred, not the officer's subjective,
        intent or belief that he or she affected an
        arrest; and
   iii) advising officers that every detention is a
        seizure, every seizure requires reasonable
        suspicion or probable cause and there is no
        legally authorized seizure apart from a "<u>Terry</u>
        stop" and an arrest; and

   c.   examples of scenarios faced by DPD officers and
        interactive exercises that illustrate proper
        police-community interactions, including scenarios
        which distinguish an investigatory stop from an arrest
        by the scope and duration of the police interaction;
        between probable cause, reasonable suspicion and mere
        speculation; and voluntary consent from mere
        acquiescence to police authority.

E.   Custodial Detention Training

115. The DPD shall provide all DPD recruits, officers and
     supervisors with annual training on custodial detention.
     Such training shall include DPD policies regarding arrest,
     arraignment, holds, restrictions, material witness and
     detention records.

116. The DPD shall advise officers that the DPD arraignment
     policy shall not be delayed because of the assignment of the
     investigation to a specialized unit, the arrest charge(s),
     the availability of an investigator, the gathering of
     additional evidence or obtaining a confession.

117. The DPD shall advise officers that whether an individual is
     a material witness and whether that material witness should
     be committed to custody is a judicial determination.

F.   Supervisory Training

118. The DPD shall provide supervisors with training in the

36