**Exhibit 6G - Craighead 2010 Appeal Application**

**STATE OF MICHIGAN**
**IN THE COURT OF APPEALS**

**PEOPLE OF THE STATE OF MICHIGAN,**

                    Appellee

vs.

**MARK T. CRAIGHEAD,**

                    Appellant

Court of Appeals No. 301465
Lower Court No. 00-007900

MICHIGAN INNOCENCE CLINIC
University of Michigan Law School
By: Bridget M. McCormack (P58537)
David A. Moran (P45353)
Michael Shaffer, Student Attorney
Adam Thompson, Student Attorney
Katherine O'Connor, Student Attorney
Attorneys for the Defendant
625 South State Street
1029 Legal Research Building
Ann Arbor, MI 48109
(734) 763-9353

**<u>DELAYED APPLICATION FOR LEAVE TO APPEAL</u>**

# TABLE OF CONTENTS

Table of Authorities.................................................................................................................iv

Statement of Facts Explaining Delay..............................................................................vi

Judgment Appealed From and Relief Sought......................................................vii

Jurisdiction.................................................................................................................vii

Statement of Question Involved.........................................................................viii

Statement of Facts.........................................................................................1

Introduction to the Relevant Facts.....................................................................1

Detailed Statement of Facts................................................................................4

Standard of Review.............................................................................................14

Argument............................................................................................................14

    I.    The Trial Court Abused Its Discretion in Denying Mr.
           Craighead's Motion For Relief from Judgment Given The
           Uncontroverted Evidence Establishing That Mr. Craighead
           Was Locked Into Sam's Club In Farmington Hills The
           Night The Crime Was Committed in Detroit........................................14

           A.  Mr. Craighead's New Evidence Is Newly Discovered........................16

           B.  Mr. Craighead's Newly Discovered Evidence Would
               Cause the Jury to Reach a Different Outcome if Presented
               at Retrial.............................................................................19

               1.  The phone records, if presented to a jury, would result
                   in Mr. Craighead's acquittal on retrial......................................19

               2.  The trial court erred in ruling that the newly discovered
                   evidence would not likely cause a different result at trial.................21

           C.  Mr. Craighead's Newly Discovered Evidence Is Not
              Cumulative..............................................................................26

ii

     D. Mr. Craighead's Newly Discovered Evidence Could Not
        Have Been Discovered at Trial through Reasonable
        Diligence.................................................................................28

Conclusion........................................................................................................31

Appendix A – Map of 3210 East Vernor, Detroit, to 19990 Beech Daly, Redford Township

Appendix B – Map of 19990 Beech Daly, Redford Township, to 24800 Haggerty Road, Farmington Hills

Appendix C – Map of 3210 East Vernor, Detroit, to 24800 Haggerty Road, Farmington Hills

Appendix D – Farmington Hills Police Department FOIA Request and Response

Appendix E – Excerpt of Sam's Club Ameritech Telephone Bill, June-July 1997

Appendix F – Excerpts of Ameritech Detroit White Pages, 1996-1997, and 1997-1997 and Intelius Phone Report

Appendix G – Randle Craighead People Search Results

Appendix H – Latoya Antonio Affidavit

Appendix I – Judd Grutman Affidavit

Appendix J – Chad Ray Affidavit

Appendix K – Excerpt of Sam's Club Ameritech Telephone Bill, April-May 1997

Appendix L – April 29, 2009 and June 30, 2010 Polygraph Examination Report

iii

# TABLE OF AUTHORITIES

**Cases**

*Anton v State Farm Mut. Auto Ins. Co.*, 238 Mich App 673; 607 NW2d 123(1999) ....... 21

*Fry v Pliler*, 551 US 112; 127 S Ct 2321; 168 L Ed 2d 16 (2007) ................................... 21

*People v Baldwin*, No 236855 (Mich App Sept 23, 2003) ............................... 16

*People v Baydoun*, No 281972 (Mich App Jan 12, 2010) ................................ 17

*People v Burton*, 74 Mich App 215; 253 NW2d 710 (1977) ...................................... 19, 20

*People v Cress*, 468 Mich 678, 664 NW2d 174, (2003) ...................................... 15, 16, 19

*People v Deering*, No 274208 (Mich App Dec 11, 2008) ................................ 28

*People v Dixon*, 217 Mich App 400; 552 NW2d 663 (1996) ........................... 16

*People v Duncan*, 414 Mich 877; 322 NW2d 714 (1982) ................................ 26

*People v Leonard*, 224 Mich App 569; 569 NW2d 663 (1997) ...................... 14

*People v McSwain*, 259 Mich App 654, 681; 676 NW2d 236, 250 (2003) ...................... 14

*People v Nixon*, No 266033 (Mich App Mar 1, 2007) ...................................... 26

*People v Unger*, 278 Mich App 210, 217; 749 NW2d 272, 283 (2008) ................ 14, 15

*People v Washington*, 468 Mich 667; 664 NW2d 203 (2003) .......................... 14

*United States v Varoudakis*, 233 F3d 113 (1st Cir 2000) ................................ 21

**Statutes**

MCL 750.227b ................................................................................................ 1

MCL 750.321 .................................................................................................. 1

**Other Authorities**

George B. Eichorn, *Detroit Sports Broadcasters: On the Air* (Arcadia Publishing, 2003)
at p. 97 .......................................................................................................... 8

iv

**Rules**

MCR 6.500..................................................................................................................... 14

MCR 6.509(A) .............................................................................................................. vii

MCR 7.205(F).............................................................................................................. vii

MCR 7.205(F)(3) .......................................................................................................... vii

## STATEMENT OF FACTS EXPLAINING DELAY

Mr. Craighead submits this delayed application for leave to appeal because factors beyond his control prevented him from filing it within twenty-one days of the trial court's order denying his motion for relief from judgment. In particular, the transcripts of the final hearing on Mr. Craighead's motion, which included the only statement of the court's findings and order on the record, were not available until August 16, 2010. The trial court did not issue any written order or opinion other than its findings and order delivered orally at the July 14, 2010, hearing. Mr. Craighead could not properly support this application for leave to appeal without having the transcript of the July 14, 2010, hearing. He therefore could not file this application until the transcript became available, some 33 days after the trial court denied the motion for relief from judgment.

In addition, since Mr. Craighead is currently represented by the Michigan Innocence Clinic at the University of Michigan Law School, law students must be heavily involved in the drafting of this application for leave to appeal. When undersigned counsel received the transcript after August 16, 2010, the Fall Term had not yet started. Only once students began working in the Innocence Clinic after Labor Day 2010 was it possible to assign students to review the transcript and begin work on this application. This Court and the Michigan Supreme Court have long recognized that the value of student practice justifies flexibility as to appellate deadlines.

In any event, this application for leave to appeal is filed well within the one-year period for filing a delayed application.

## JUDGMENT APPEALED FROM AND RELIEF SOUGHT

Defendant-appellant Mark T. Craighead appeals from the July 14, 2010, oral order of the Wayne County Circuit Court denying his motion for relief from judgment on the merits. (Evidentiary Hearing Transcript 117-123, July 14, 2010.) In light of the compelling newly discovered evidence of Mr. Craighead's innocence, and the near certainty that this evidence would have led to a different outcome at trial, Mr. Craighead asks that this Court grant this application for leave to appeal, reverse the denial of his motion for relief from judgment, and order a new trial in this case.

## JURISDICTION

This Court has jurisdiction over this delayed application for leave to appeal pursuant to MCR 6.509(A), which provides for an application for leave to appeal from the trial court's denial of the defendant's motion for relief from judgment. MCR 6.509(A) provides that the twelve-month time limit of MCR 7.205(F)(3) applies to any delayed application for leave to appeal. Mr. Craighead's motion for relief from judgment was denied on July 14, 2010. Accordingly, this delayed application for leave to appeal is filed within the twelve-month period set forth in MCR 7.205(F), and this Court therefore has jurisdiction.

## STATEMENT OF QUESTION INVOLVED

At his trial, Mr. Craighead presented an alibi defense, namely that he was in Farmington Hills working his usual overnight shift at Sam's Club, which locked the overnight shift workers into the store, at the precise time the crime was occurring in Detroit. During deliberations, the jury asked for documentary proof that Mr. Craighead worked that particular night, but such proof was not available because Sam's Club had, by the time of trial, lost the employment records that would have shown whether Mr. Craighead worked that particular night.

At an evidentiary hearing this year, Mr. Craighead presented newly discovered phone records from Sam's Club proving that Mr. Craighead made four phone calls from inside the locked store the night of the crime, including one call at the precise time the victim's truck was set on fire in Redford Township. Mr. Craighead also presented testimony from the two recipients of those four phone calls, both of whom confirmed that no one from Sam's Club other than Mr. Craighead would have been calling them in the middle of the night.

The question presented, therefore, is:

In light of this newly discovered evidence, did the trial court apply an improper legal standard and then erroneously deny the motion for relief from judgment?

The Trial Court answers, "No."

The Defendant-Appellant answers, "Yes."

## STATEMENT OF FACTS

After a jury trial in the Third Judicial Circuit Court, County of Wayne, Case No. 00-007900-01, Judge Vera Massey Jones presiding, Mark Craighead was convicted on June 25, 2002, of voluntary manslaughter, MCL 750.321, and possession of a firearm in the commission of or attempt to commit a felony, MCL 750.227b. On August 5, 2002, Judge Jones sentenced Mr. Craighead to 40 months to 15 years on the conviction for voluntary manslaughter and to a consecutive 24 months for felony firearm. Mr. Craighead is currently on parole, residing at 16147 Inverness, Detroit, MI 48221.

In November 2009, Mr. Craighead filed a motion for relief from judgment based on newly discovered evidence showing that he was at work at the time the crime was committed. The trial court held a two-day evidentiary hearing on the motion on June 30, 2010, and July 14, 2010. The trial court orally denied the motion at the end of the July 14, 2010, hearing. (Evidentiary Hearing Transcript 117-123, July 14, 2010.)

Mr. Craighead seeks leave to appeal the trial court's decision.

## INTRODUCTION TO THE RELEVANT FACTS

Mark Craighead served more than seven years in prison for a crime that he did not commit. As the newly discovered evidence now shows, Mr. Craighead could not have killed Chole Pruett in Detroit on the night of June 26–27, 1997, because he was locked inside a Sam's Club store in Farmington Hills where he was employed, more than twenty-four miles from the scene of the crime, at the time that the killing occurred. Specifically, the phone records newly discovered by the Michigan Innocence Clinic establish that Mr. Craighead made a telephone call from Sam's Club to his friend, Isaac "Ike" Griffin (a well-known sports radio personality known as "MegaMan"), just eight

1

minutes before Mr. Pruett's truck was discovered by police, engulfed in flames, in a vacant lot behind an elementary school in Redford Township.

Mr. Craighead's conviction at trial was based entirely on an alleged "confession" taken by Investigator Barbara Simon of the Detroit Police Department.[1] Mr. Craighead's alleged "confession"—the only evidence that the prosecution presented at trial linking him to the killing—is completely inconsistent with the physical evidence discovered at the scene. This purported "statement" describes none of the distinctive facts of the crime—e.g., the posture or location of the body; number of shots fired; or caliber or type of weapon used. It recounts only in vague terms nothing more than a struggle and an accidental discharge of a gun. But the scene suggested a brutal and deliberate execution-style killing.[2] Moreover, despite evidence of "selective searching" in some rooms of the apartment, police never recovered any fingerprints. (Trial Tr 43–44, 55, June 20, 2002.)

---

[1] As the extensive record at trial and on appeal reflects, Mr. Craighead allegedly made this "statement" to investigator Barbara Simon more than three years after the crime occurred. (Trial Tr 105–112, June 20, 2002.) Before Mr. Craighead's interview with investigator Simon—his third with Detroit police regarding Mr. Pruett's death—investigator Ronald Tate, the original officer-in-charge, had twice interviewed Mr. Craighead and twice dismissed him as a suspect. (Trial Tr 78–79, 80–82, June 20, 2002.)

[2] Sergeant David Babcock, of the Detroit Police Department Forensic Services Division, investigated the crime scene at 3210 East Vernor on June 27, 1997. (Trial Tr 37–38, June 20, 2002.) Sgt. Babcock observed at least three "impact wounds, very suggestive of bullet wounds" on the body, and found two bullets that had passed through a closet door and struck a clothes dryer. (*Id.* at 42.) He found two more bullets lodged in the carpet beneath the body—suggesting the victim was shot at least twice after falling to the floor. (*Id.* at 45.) Dr. Cheryl Loewe, of the Wayne County medical examiner's office, conducted the postmortem exam. (*Id.* at 60–62.) She reported that one bullet passed through the victim's neck from right to left; one entered the right lower back and exited near the navel; one entered the right buttock and exited below the navel; and one passed through the right thigh from back to front. (*Id.* at 62–64.) She concluded that a person with such injuries would have died within minutes. (*Id.* at 64.) She found no evidence of contact wounds or close-range firing; no stippling, soot, or powder burns—as would presumably have resulted from a struggle over a gun ending with an accidental discharge. (*Id.* at 64–65.)

2

Despite finding .380 ammunition at the scene and a .380 caliber pistol in Mr. Pruett's car, police never found the .44 caliber murder weapon. (*Id.* at 27–28, 58, 88, 103.)

Mr. Craighead was not arrested until some three years after Chole Pruett was killed, and the case did not come to trial until five years had elapsed from the killing. At his trial in 2002, Mr. Craighead's defense was that the statement extracted by Barbara Simon was false and that he was at work at the Sam's Club in Farmington Hills the night Mr. Pruett was killed in Detroit.

At the 2002 trial, a manager from Sam's Club, Martin Ryzak, confirmed that Mr. Craighead was, in fact, employed by Sam's Club in Farmington Hills at the time of Mr. Pruett's murder, and that he usually worked the overnight shift five nights a week, with Sundays and Mondays off. (Trial Tr 8-10, June 24, 2002.) However, given the time lapse between the crime and the trial, Mr. Ryzak could not recall whether Mr. Craighead had worked the overnight shift of Thursday night/Friday morning on June 26-27, 1997. (*Id.* at 13-14, 16.) Mr. Ryzak further testified that he could not produce a record of the exact days and hours that Mr. Craighead worked during the week in question, because those records had been destroyed by a water sprinkler accident. (*Id.* at 11.)

At trial, Mr. Craighead argued that Mr. Ryzak's testimony about Mr. Craighead's usual schedule and work routine, as well as Mr. Craighead's own testimony that he was not present at the scene of the crime when it occurred, provided reasonable doubt sufficient to establish Mr. Craighead's lack of presence at the time and place where the killing occurred. (*Id.* at 121-22.) But as soon as the court excused the jury to deliberate, the jury sent a note out asking the court, "Is there a paycheck stub or solid evidence that a forty-hour week was worked?" (*Id.* at 170–71.) The Court answered that the jury had to

3

deliberate and render its verdict on the basis of the evidence presented. (*Id.*) The jury then convicted Mr. Craighead of manslaughter.

Newly discovered phone records, finally received by the Michigan Innocence Clinic in 2009 and presented to the trial court in 2010, but unavailable and unknown to Mr. Craighead, his trial counsel, or his appellate counsel, now conclusively substantiate Mr. Craighead's alibi. These records provide clear documentary proof that Mr. Craighead was locked in at work at Sam's Club in Farmington Hills on the night Mr. Pruett was killed in Detroit, and that he made a phone call to Ike Griffin just minutes before Mr. Pruett's burning truck was found in Redford Township. Moreover, the phone records from Sam's Club show that Mr. Craighead made at least four calls from store phones while working his regular night shift hours on June 26–27, 1997.

### DETAILED STATEMENT OF FACTS

#### Relevant Evidence at Trial Regarding Timing and Mr. Craighead's Alibi

Melvin Howard last saw Chole Pruett around four or five o'clock in the evening on Thursday, June 26, 1997, the day before Mr. Pruett's body was discovered. (Trial Tr 70–71, June 20, 2002.) Mark Craighead last saw Mr. Pruett on either June 25, 1997, or June 26, 1997, around four or five o'clock in the afternoon. Mr. Craighead and Mr. Pruett went out to Friday's at Evergreen and Ten Mile in Southfield, Michigan, to have a few drinks and talk. (*Id.* at 54–55.) Mr. Pruett then dropped Mr. Craighead off at Mr. Craighead's home around six or seven o'clock in the evening, because Mr. Craighead had to go to work at either eight or nine o'clock. (*Id.* at 57.)

4

At 2:35 a.m. on June 27, 1997, Officer Lawrence Turner of the Redford Township police department responded to a call of a vehicle fire. (Trial Tr 17–18, June 20, 2002.) Officer Turner found the vehicle behind a school at 19990 Beech Daly Road, fully engulfed in flames. (*Id.* at 18–19.) After the fire was extinguished, Officer Turner identified the vehicle as a 1996 Chevy Tahoe owned by Chole Pruett. (*Id.* at 19–20.) Officer Turner observed only one set of vehicle tracks leading to the area where he found the truck on fire.

Late in the afternoon of Friday, June 27, 1997, around 3:00 p.m., Erhonda Gray-Miller called the police after she saw Mr. Pruett's body inside his apartment at 3210 East Vernor Street in Detroit. (*Id.* at 5–6, 8.) Mr. Pruett's apartment is more than sixteen miles from the place where Officer Turner found Mr. Pruett's truck on fire. (See Map of 3210 East Vernor, Detroit, to 19990 Beech Daly, Redford Township, Appendix A (App. B to Motion for Relief from Judgment).)

Martin Ryzak worked as a business manager at the Sam's Club on Haggerty Road in Farmington Hills in June and July 1997. (Trial Tr 7–8, June 24, 2002.) Mr. Ryzak testified that during the month of June 1997, Mr. Craighead worked in the freezer section at Sam's Club, doing "overnight merchandising," on the night shift from 9:00 p.m. to 5:00 a.m. or 10:00 p.m. to 6:00 a.m. (*Id.* at 9.) The Sam's Club at 24800 Haggerty Road was at least eight miles from the spot where Officer Turner found the truck on fire in Redford Township and more than twenty-four miles from Chole Pruett's apartment in Detroit. (See Map of 19990 Beech Daly, Redford Township, to 24800 Haggerty Road, Farmington Hills, Appendix B (App. C to Motion for Relief from Judgment); Map of

5

3210 East Vernor, Detroit, to 24800 Haggerty Road, Farmington Hills, Appendix C
(App. D to Motion for Relief from Judgment).)

Mr. Ryzak recalled that Mr. Craighead had Sundays and Mondays off in order to
match his wife's schedule, and he worked the other five days of the week. (*Id.* at 9–10.)
He further stated that Mr. Craighead was a full-time employee working on the night shift;
that the freezer area needed restocking each night; that Thursday and Friday were the
busiest nights of the week due to the need to restock in advance of heavy shopping on
Friday and Saturday; and that Mr. Craighead was a good employee who always showed
up for work. (*Id.* at 12–14.)

Mr. Ryzak also testified that, in accord with company policy, the doors of the
store were locked and the alarm was set during the night shift, whether or not a manager
was present in the store. Any person leaving the store would have set off an alarm that
would signal both the local police and the Sam's Club home office in Bentonville,
Arkansas. (*Id.* at 10.) The records of the Farmington Hills police department do not
record any alarms or calls from the Haggerty Road Sam's Club on June 26 or 27, 1997.
(See Ev Hr'g Tr 36-37, June 30, 2010; Farmington Hills Police Department FOIA
Request and Response, Appendix D (App. E to Motion for Relief from Judgment).)

As discussed above, Mr. Ryzak also testified that the detailed work records from
June 1997 had been lost in a sprinkler malfunction, so there was no way to prove to a
certainty that Mr. Craighead worked the night of June 26-27, 1997, and Mr. Ryzak could
not remember that particular night from five years earlier (Trial Tr 11, 13-14, 16, June
24, 2002.) Therefore, when the jury during deliberations sent out a note asking for

6

documentary proof that Mr. Craighead actually worked that night, the court replied that the jury had to rely only on the evidence actually introduced. (*Id.* at 170-171).

### Procedural History After Trial

Mr. Craighead appealed his conviction by right to this Court and argued: (1) that the court should have suppressed his police statement as the fruit of an illegal arrest by the Detroit police department; and (2) that his trial counsel failed to call an expert witness on the subject of reasons for false confessions, denying him the effective assistance of counsel. This Court affirmed Mr. Craighead's conviction over a strong dissent from Judge Whitbeck, who would have reversed because Mr. Craighead's statement was the fruit of an arrest without probable cause. *People v Craighead*, No 243856 (Mich App, Dec 22, 2005) (Whitbeck, CJ, dissenting), lv den 474 Mich 1124 (2007).

Mr. Craighead filed no motions for relief from judgment prior to the motion denied by the trial court on July 14, 2010.

### Newly Discovered Phone Records and Hearing Testimony

The Michigan Innocence Clinic, after months of requests and negotiations, obtained in August 2009 the Sam's Club telephone records for the Farmington Hills store for June and July 1997. The newly discovered phone records show that calls were made from phones in the store to telephone number (313) 393-9153 at 12:19 a.m. and 2:27 a.m. on June 27, 1997 (the latter call just 8 minutes before Chole Pruett's truck was found fully ablaze in Redford Township). (Sam's Club Ameritech Telephone Bill, June-July 1997, Appendix E, at page 9, line 12 and page 21, line 25 (App. F to Motion for Relief

7

from Judgment).) Archived copies of the Ameritech Detroit Metropolitan White Pages show that this number belonged to Marilie Griffin, residing at 500 River Place in Detroit for the entire period between September 1996 and September 1998. (Ameritech Detroit White Pages, 1996-1997, Appendix F (App. G to Motion for Relief from Judgment).)

The person at (313) 393-9153 who received those calls from Sam's Club that night was Isaac "Ike" Griffin, who was at the time a well-known Detroit sports radio personality. See George B. Eichorn, *Detroit Sports Broadcasters: On the Air* (Arcadia Publishing, 2003) at p. 97 (describing sports and radio career of Ike "Mega Man" Griffin). Mr. Griffin testified at the evidentiary hearing that he is Marilie Griffin's son, that he was a longtime friend of Mark Craighead, that he lived in his mother's home at 500 River Place in June 1997, and that (313) 393-9153 was therefore his home telephone number at the time. (Hr'g Tr 96-97, 102-105, June 30, 2010.) Mr. Griffin specifically testified that Mr. Craighead sometimes called him at Mr. Griffin's mother's home during breaks from Mr. Craighead's work on the night shift. (*Id.* at 97.) Mr. Griffin did not know anyone other than Mr. Craighead who worked at Sam's Club and he never received phone calls placed from the store by anyone else. (*Id.* at 105-106.)

Store telephone records also show calls at 11:01 p.m. and 11:02 p.m. on June 26, 1997, to telephone number (313) 836-5230. (See Sam's Club Ameritech Telephone Bill, June-July 1997, Appendix E, at page 9, lines 10–11 (App. F to Motion for Relief from Judgment).) Randle Craighead—Mr. Craighead's brother—has owned and used this telephone number continuously since 1985. (Hr'g Tr 40-41, June 30, 2010); see also Randle Craighead People Search Results, Appendix G (App. K to Motion for Relief from Judgment).) Randle Craighead had this phone number throughout the month of June

8

1997, and he still has this number today. (Hr'g Tr 40.) Randle Craighead did not know anyone other than his brother who worked at Sam's Club in Farmington Hills, and he never received phone calls placed from the store by anyone else. (*Id.* at 42.)

At the evidentiary hearing, John Wojnaroski, a forensic polygraph examiner, testified to a polygraph he administered to Mark Craighead on June 30, 2010.[3] (Hr'g Tr 20, July 14, 2010; June 30, 2010 Polygraph Examination Report, Appendix L, at 2.) During the exam, Mr. Wojnaroski questioned Mr. Craighead to determine whether he knew if anyone else placed the calls to Isaac Griffin and Randle Craighead on June 26 and 26, 1997. (Hr'g Tr 20, July 14, 2010.) In response to the question, "Other than you, do you know of anyone else who made any of those four phone calls from Sam's Club?" Mr. Craighead responded "no." (*Id.* at 22.) Mr. Craighead was then asked whether he was lying in response to his first answer; Mr. Craighead responded that he was not lying. (*Id.*) Finally, he was asked whether he knew of "anyone else who worked at Sam's Club, other than [him], who could have made those four phone calls?" (*Id.* at 22-23) Again, Mr. Craighead replied, "no." (*Id.* at 23.) At the evidentiary hearing, Mr. Wojnaroski testified that Mr. Craighead replied truthfully in response to each of those questions. (*Id.* at 23; June 30, 2010 Polygraph Examination Report, Appendix L, at 2.)

In addition to providing documentary proof of Mr. Craighead's alibi, this newly discovered evidence only further highlights the lack of evidence in support of Mr.

---

[3] At the evidentiary hearing, the trial court refused to admit evidence that Mr. Craighead had passed an April 29, 2009 polygraph exam, also administered by Mr. Wojnaroski. (*Id.* at 24-25.) With respect to that exam, Mr. Wojnaroski reported that Mr. Craighead responded truthfully in saying that he did not know who caused Mr. Pruett's fatal injuries, that he did not cause Mr. Pruett's fatal injuries, and that he was not present when Mr. Pruett was shot. (April 29, 2009 Polygraph Examination Report, Appendix L, at 1 (App. O to Motion for Relief from Judgment).)

9

Craighead's conviction at his original trial. Indeed, the prosecution never presented any physical evidence linking Mr. Craighead to the crime. Moreover, Lieutenant Billy Jackson of the Detroit Police Department conceded at a pretrial evidentiary hearing that of the *twenty-five* witnesses he interviewed, *none* linked Mr. Craighead to Chole Pruett's death. (Ev Hr'g Tr 81, 86–87, Dec. 13, 2000.)

At the time of his trial and appeal, neither Mr. Craighead, nor his trial counsel, nor his appellate counsel knew of, or could have with reasonable diligence discovered, the phone records documenting the specific phone calls that Mr. Craighead made from Sam's Club on the night of June 26–27, 1997. (Hr'g Tr 20-26, 46-55, June 30, 2010; 144, July 14, 2010.) As Mr. Craighead testified, he could not remember in 2002—more than five years after what from his perspective was just another unremarkable night at work—whether he had made phone calls from work that night, at what time, or to whom. Mr. Craighead testified that he could not remember a specific conversation in which he informed his trial counsel that he sometimes made telephone calls from work, though he "thought [he] told all [his] attorneys." (Hr'g Tr 72, June 30, 2010.) However, given that it took the Michigan Innocence Clinic many months to obtain those records from Ameritech, it is highly improbable that trial counsel could have, with reasonable diligence, obtained them in time for trial. (See Latoya Antonio Affidavit, Appendix H (App. L to Motion for Relief from Judgment); Judd Grutman Affidavit, Appendix I (App. M to Motion); Chad Ray Affidavit, Appendix J (App. N to Motion for Relief from Judgment).) The prosecution also stipulated that the Michigan Innocence Clinic served at least seven subpoenas to obtain the Farmington Hills Sam's Club phone bill for June and July 1997. (Hr'g Tr 12, June 30, 2010.)

10

Moreover, as Valerie Newman, Mr. Craighead's counsel on appeal, testified, she received purported phone records from Sam's Club at the time of Mr. Craighead's appeal, in response to a subpoena. (Hr'g Tr 49-50, July 14, 2010.) Ms. Newman reviewed those records and supplied them to Mr. Craighead and to Mr. Craighead's father to review, but none of them found any relevant calls listed in these records that Sam's club disclosed. (*Id.* at 50-57.)

For reasons unknown to anyone, the purported records supplied by Sam's Club in 2002 were incomplete and did not contain any of the calls shown in the newly discovered records finally received from Ameritech, by the Michigan Innocence Clinic, in 2009. (*Id.* at 91.) Despite the diligent efforts by appellate counsel to uncover evidence in Mr. Craighead's defense, neither Ms. Newman nor Mr. Craighead could have known at the time they received the records that they were not in fact complete, and did not contain the crucial, specific call records which would ultimately prove Mr. Craighead's innocence. Had trial counsel pursued the same line of investigation as appellate counsel, he would have certainly received these same incomplete and unhelpful records in response.

### Trial Court Ruling on Motion for Relief from Judgment

Mr. Craighead, represented by the Michigan Innocence Clinic, filed his motion for relief from judgment in November 2009, raising the claim that the trial court should grant Mr. Craighead a new trial because the newly discovered evidence of the phone calls he made from Sam's Club conclusively demonstrated his innocence, and because neither he, nor his trial counsel, nor his appellate counsel, could have with reasonable diligence discovered the records at the time of his trial or appeal. Mr. Craighead further raised an

11

alternative claim that, if the trial court found the records not newly discovered because they could have been found with reasonable diligence, then trial counsel and appellate counsel were ineffective for failing to discover and present those records. Based on the testimony of trial and appellate counsel at the subsequent hearings on his motion, Mr. Craighead does not argue the second claim any further in this appeal.

On July 14, 2010, the trial court denied Mr. Craighead's motion for relief from judgment, issuing its findings of fact and final order on the record, at the conclusion of the second evidentiary hearing on the motion. (See Hr'g Tr 117-123, July 14, 2010.) The trial court found that the records were not newly discovered; that in its opinion the records did not establish Mr. Craighead's innocence; and moreover that the records would not have caused a different outcome at trial.

In supporting its opinion that the records were not newly discovered, Judge Jones stated: "So, you haven't sustained your burden to show me that this would actually show—first of all, I can't really say it's newly discovered. Because I think if Steve Fishman [trial counsel] had known about it, he would have found it." (*Id.* at 122; emphasis added.) In explaining her opinion that the records did not establish Mr. Craighead's innocence, Judge Jones stated: "If I had confidence that the evidence that the defendant presents me now actually shows that he made phone calls on the date and time in question, if I believe that, if I had the least bit of confidence in it, I would grant your motion; but I don't." (*Id;* emphasis added.)

The only reason Judge Jones gave for not being confident that Mr. Craighead made the phone calls in question is that the phone bill revealed that the same two phone numbers (Isaac Griffin's and Randle Craighead's) were called several times during other

12

nights that month and, on one occasion, within minutes of each other at 1:37 p.m. and 1:38 p.m. on May 15, that is, during the day shift. (*Id.* at 10-11; see also Sam's Club Ameritech Telephone Bill, April-May 1997, Appendix K, at page 37, line 16-17; Hr'g Tr 10-11, July 14, 2010.) In other words, because two calls were made back-to-back to Randle Craighead and Isaac Griffin during a day shift, Judge Jones announced that she had no reason to believe that it was Mr. Craighead who made the four calls to Randle Craighead and Isaac Griffin during the night shift of June 26-27, 1997. But neither Mr. Craighead nor Mr. Ryzak ever testified that Mr. Craighead worked **exclusively** on the night shift, and it is hardly surprising that an employee who works night shifts would occasionally work a day shift as well.

The uncontroverted facts remain that Randle Craighead and Isaac Griffin received multiple phone calls from Sam's Club during the night shift of June 26-27 (and during multiple other night shifts that month as well), that the night shift workers were locked into Sam's Club, and that neither Randle Craighead nor Isaac Griffin knew anyone other than Mark Craighead who would be calling them from Sam's Club in Farmington Hills, much less anyone else who would be calling them in the middle of the night.

Finally, in holding that the records would not have caused a different outcome at trial, Judge Jones stated: "But then beyond that, let's say that [Fishman] got stonewalled or whatever, but does it actually show or would it cause a different result in this trial? And you've got a problem showing that he's the one who made these calls because you can't convince me of that. And I'm not going beyond a reasonable doubt. If I thought there was a reasonable opportunity that he had been the one who made these, I'd go with him." (*Id.* at 123; emphasis added.) Judge Jones also stated: "The jury didn't ask for

13

phone records.... [T]hey said, is there any proof that he was at work that day." (*Id.* at 118; emphasis added.)

## STANDARD OF REVIEW

A trial court's ruling on a motion for relief from judgment under MCR 6.500, similar to a motion for new trial, is reviewed for abuse of discretion. *People v McSwain*, 259 Mich App 654, 681; 676 NW2d 236, 250 (2003). The findings of fact that supported the ruling are reviewed for clear error. *Id.* Underlying questions of law are reviewed de novo. *People v Washington*, 468 Mich 667, 670-671; 664 NW2d 203 (2003).

A trial court abuses its discretion when it "chooses an outcome that falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272, 283 (2008) (citation omitted. In reviewing a ruling on a motion for new trial, this Court "examine[s] the reasons given by the trial court. . . . Where the reasons given by the trial court are inadequate or not legally recognized, the trial court abused its discretion." *People v Leonard*, 224 Mich App 569, 580, 569 NW2d 663, 669 (1997) (citation omitted).

## ARGUMENT

I.   **THE TRIAL COURT ABUSED ITS DISCRETION IN DENYING MR. CRAIGHEAD'S MOTION FOR RELIEF FROM JUDGMENT GIVEN THE UNCONTROVERTED EVIDENCE ESTABLISHING THAT MR. CRAIGHEAD WAS LOCKED INTO SAM'S CLUB IN FARMINGTON HILLS THE NIGHT THE CRIME WAS COMMITTED IN DETROIT**

The trial court abused its discretion when it denied Mr. Craighead's motion for relief from judgment. Mr. Craighead presented the trial court with compelling new

14

evidence that resolves any reasonable doubt about his whereabouts on the night Chole Pruett was murdered. This new evidence shows conclusively and without any contradiction that Mr. Craighead was working twenty-four miles away from the crime scene and making phone calls from work to well-known sports radio personality Isaac "Mega Man" Griffin and to his brother, Randle Craighead, during the relevant hours on June 26 and 27. Since the night shift workers were locked in and one of the phone calls was made just minutes before the burning truck was found in Redford Township, Mr. Craighead could not have committed this crime.

The Ameritech phone bills, the testimony from Randle Craighead and Isaac Griffin, and the results of Mr. Craighead's polygraph exam are newly discovered evidence requiring that Mr. Craighead be given a new trial. See *People v Cress*, 468 Mich 678, 692, 664 NW2d 174, 182 (2003). This evidence meets all four requirements outlined in *Cress*: (1) it is newly discovered; (2) it would result in a different result on retrial; (3) it is not cumulative of trial evidence; and (4) it could not have been discovered at trial through reasonable diligence. *Id.*

The trial court clearly and unreasonably erred in its findings on the *Cress* factors, leading to a result "outside the range of reasonable and principled outcomes." *Unger*, 278 Mich App at 217. Specifically, the trial court denied the new trial solely because the phone records show that Mr. Craighead also called Isaac Griffin and Randle Craighead during a day shift and, from that fact, the trial court decided that it could not be "confident" that Mr. Craighead was the one who called Isaac Griffin and Randle Craighead during the night shift of June 26-27.

15

Judge Jones' reasoning was, with all due respect, completely irrational. The fact that the phone bills shows that Mr. Craighead made multiple phone calls to both Isaac Griffin and Randle Craighead throughout the month, including during a day shift, <u>in no way undermines the uncontroverted fact that phone calls were made from Sam's Club to both Isaac Griffin and Randle Craighead the night of the killing, including one just before the victim's burning truck was found in Redford Township, and that both Mr. Griffin and Randle Craighead confirmed that no one other than Mark Craighead ever called them from Sam's Club, much less called them in the middle of the night.</u>

Accordingly, this Court should grant leave to appeal so that the trial court's ruling may be reversed and Mr. Craighead may be granted the new trial to which he is entitled.

### A.      Mr. Craighead's New Evidence Is Newly Discovered

The trial court clearly erred by not finding that the evidence Mr. Craighead presented at his evidentiary hearing is "newly discovered."

Perhaps the most important factor in deciding whether "the evidence itself, not merely its materiality, was newly discovered," *Cress*, 468 Mich at 692, is whether the defendant and his counsel knew about the evidence at trial. See *People v Dixon*, 217 Mich App 400, 410; 552 NW2d 663, 670 (1996). However, the defendant must have known or should have known that the evidence actually existed; it is not enough that he knew an allegedly exculpatory piece of evidence had the *potential* of coming to fruition. See *People v Baldwin*, No 236855 (Mich App Sept 23, 2003) (holding that trial court erred in finding other person's confession to defendant's alleged crime was not newly discovered evidence, where trial court's only reason was that other person's "potential

16

involvement in the case was known at trial"). This Court also has held that evidence is newly discovered evidence where it was not reasonably possible for the defendant to present it at trial. See *People v Baydoun*, No 281972, (Mich App Jan 12, 2010) (subsequent confessor's "whereabouts were unknown at the time of defendant's trial").

Here, the trial court never explicitly ruled that the Ameritech phone bills and testimony presented at Mr. Craighead's hearing were not in fact "newly discovered." The court did, however, imply as much in its ruling. The court stated that "I can't really say it's newly discovered. Because I think if Steve Fishman [Mr. Craighead's trial counsel] had known about it, he would have found it." (Hr'g Tr 122, July 14, 2010). This is the trial court's only statement concerning the newly discovered evidence prong of the *Cress* test.

Mr. Craighead clearly satisfies the first prong of the *Cress* test, and the trial court's (apparent) finding to the contrary is a *non sequitur*. The trial court's statement that trial counsel would have found the records if he had known about them has nothing to do with whether the records are newly discovered evidence now. The fact is that trial counsel did not know about the phone records and therefore did not try to obtain them. Mr. Craighead also did not know about the phone records. When he went to trial five years after the killing of Chole Pruett, Mr. Craighead had no memory of the night of June 26-27, 1997, much less any memory of whether he made any personal phone calls that night from work.

In fact, it was only in 2009, after the Michigan Innocence Clinic obtained the Ameritech phone bills, that Mr. Craighead discovered that he had made calls from Sam's Club phones on the night of June 26-27, 1997. As Mr. Craighead testified, "[t]he only

17

reason I remember is because the documents were produced in front of me. I seen that I made those phone calls." (Hr'g Tr 82, June 30, 2010.) It clearly would be error to hold Mr. Craighead responsible for knowing, at trial, about the existence of an exculpatory phone bill when in fact all he knew, at most, was that five years earlier he occasionally made personal phone calls from Sam's Club phones while at work there. In any event, the trial court did not make such a holding and instead found the first prong not satisfied solely for the irrelevant reason that trial counsel would have tried to find the phone bills if he had known about them.

Not only were Mr. Craighead and his trial counsel unaware at trial of the existence of this evidence, it is clear that they could not have learned about the phone records by the time of trial because when appellate counsel tried to get the phone records, she was given an incomplete set of phone records that did not include the hundreds of phone calls made to Detroit by Sam's Club employees (Hr'g Tr 47-49, 54-55, 87-88, July 14, 2010.) In fact, it took many months of extraordinary effort on the part of a team of Michigan Innocence Clinic students, (see Antonio Affidavit, Appendix H (App. L to Motion for Relief from Judgment); Judd Grutman Affidavit, Appendix I (App. M to Motion for Relief from Judgment); Chad Ray Affidavit, Appendix J (App. N to Motion for Relief from Judgment), including at least seven subpoenas to Walmart and AT&T, to obtain the correct phone bill. (Hr'g Tr 12, June 30, 2010.) Trial counsel cannot possibly be faulted for failing to spend months trying to get a phone bill with a looming trial date.

Mr. Craighead has clearly shown that he did not and could not have known at trial about the new evidence he presented at his evidentiary hearing; neither he nor his trial counsel knew that he had made personal phone calls from Sam's Club on that particular

18

night five years earlier and, even if they had known, there is no reasonable prospect that they could have obtained the correct phone bill in time for trial. The phone bill was finally obtained, after many months of effort, in August 2009, and only then was it discovered for the first time that Mr. Craighead had made personal phone calls the night of the killing from Sam's Club phones. Therefore, the trial court erred in finding that the evidence presented at Mr. Craighead's evidentiary hearing was not newly discovered.

**B.      Mr. Craighead's Newly Discovered Evidence Would Cause the Jury to Reach a Different Outcome if Presented at Retrial**

The trial court erred when it ruled that the newly discovered evidence, proving that Mr. Craighead was at work the night of the murder, would probably not convince a jury to acquit Mr. Craighead. The records documenting Mr. Craighead's phone calls to his brother and his friend almost certainly would have resulted in his acquittal as it would have provided the evidence the jury was looking for to confirm his already strong alibi.

**1.      The phone records, if presented to a jury, would result in Mr. Craighead's acquittal on retrial.**

Mr. Craighead demonstrated, as he was required to do, that the new evidence upon retrial would probably cause a different result. *Cress*, 486 Mich at 692. Michigan courts have recognized that new evidence corroborating a defendant's alibi satisfies this criteria. See, e.g., *People v Burton*, 74 Mich App 215; 253 NW2d 710 (1977) (holding that newly discovered witness testimony corroborating alibi warranted new trial).

The newly discovered evidence in this case consists of phone records that corroborate Mr. Craighead's lack-of-presence defense. Indeed, as objective,

19

documentary evidence, the records are even more concrete and compelling than the witness testimony in *Burton*. See 74 Mich App at 253.

Courts also weigh the relative weakness of the inculpatory evidence presented at trial against the relative strength of the exculpatory evidence newly presented, and the effect such new evidence might have on a second jury. *Id.* at 223. The case against Mr. Craighead was extremely thin. The prosecution presented no physical evidence and no eyewitnesses tying Mr. Craighead to the crime, despite a multi-year investigation that included at least 25 witnesses. (Ev Hr'g Tr 87, Dec. 13, 2000.) As both the majority of this Court and the dissent in the direct appeal concluded, there was not even probable cause to arrest Mr. Craighead until he made a statement to the police on June 20, 2000, some three years after the killing. *Craighead*, No. 243856 (Dec 22, 2005) at *2 (majority concluding Mr. Craighead's initial statements to police provided probable cause); *id.* at *5 (dissenting judge finding "very little in the record to sustain a finding that the prosecution sustained its burden of showing probable cause for a warrantless arrest at Craighead's home on the evening of June 20, 2000).

In fact, the only evidence of guilt at trial was the vague, non-particularized statement Mr. Craighead gave to investigator Barbara Simon after hours of interrogation. (Trial Tr 110, June 20, 2002.) This "confession," describing an accidental shooting following a struggle over the gun, was entirely inconsistent with the forensic evidence, which concluded that Mr. Pruett was killed following premeditated, execution-style gunshots fired from above his prone body. The exculpatory power of the phone records crushes any evidence of Mr. Craighead's guilt presented at trial. In contrast to the prosecution's weak inculpatory evidence against Mr. Craighead, the Sam's Club phone

20

records provide strong evidence of his innocence that would lead any reasonable jury to acquit him of this offense.

Evidence of the jury's decision-making processes, documented in notes submitted to the trial court, provide valuable insight into what the jury was thinking during deliberations, and the ease or difficulty with which it reached its verdict. See *Anton v State Farm Mut. Auto Ins. Co.*, 238 Mich App 673, 689; 607 NW2d 123, 132 (1999) (finding jury's two notes issued with its verdict indicated jury properly considered the issues before it and did not act on passion or prejudice); *Fry v Pliler*, 551 US 112, 125; 127 S Ct 2321; 168 L Ed 2d 16 (2007) (quoting *United States v Varoudakis*, 233 F3d 113, 127 (1st Cir 2000) (looking to jury's note that it was at an "impasse" as a sign that it was uncertain about defendant's guilt). Here, Mr. Craighead's jury was clearly focused on the question of whether there were any records supporting Mr. Craighead's alibi when it sent out a note stating: "Is there a paycheck stub or solid evidence that a forty-hour week was worked?" (Trial Tr 170-71, June 24, 2002 (emphasis added).) The jury could not have given a clearer indication that it was looking for proof of Mr. Craighead's alibi, but ultimately, without documentary evidence that he was at work that particular night, convicted him. Given the jury's pointed request for this crucial type of evidence, it almost certainly would have arrived at a different outcome had it seen the phone records.

## 2. The trial court erred in ruling that the newly discovered evidence would not likely cause a different result at trial.

The trial court's reasoning in holding that the Sam's Club phone records would not likely result in an acquittal if presented to a jury was irrational. It's clear that the trial court simply failed to grasp the significance of the phone records.

21

The trial court ignored the evidentiary standard for granting a new trial in reaching its determination. The appropriate question is whether the new evidence, if presented at retrial, would probably result in a different result. By using terms such as "convince" and "confidence" in referring to whether the records conclusively show that Mr. Craighead placed the calls from Sam's Club, the trial court raised the evidentiary burden from probability to near-certainty. While the evidence actually does meet the near-certainty threshold, see infra at 26-29, the trial court erred in requiring that the evidence meet this standard in order to merit a new trial.

While the trial court's opinion makes it clear that it did not properly apply this *Cress* factor, even if it was correct in its application, it was unreasonable in finding that the new evidence would not have resulted in a different outcome at trial. Rather than examining the implications of the phone records, the trial court chose instead to hinge its opinion on irrelevant details from the evidentiary hearing and faulty logical leaps.

The trial court gave considerable weight to Randle Craighead and Isaac Griffin's estimates of how often Mr. Craighead called them. Each testified that Mr. Craighead called them from Sam's Club regularly during his shifts, testimony which was substantiated by the phone records. Yet because they testified that Mr. Craighead called them more frequently than was reflected on the entire phone record, the trial court claimed that the witnesses were "exaggerating." (Hr'g Tr 119-120, July 14, 2010.)

These witnesses' supposedly inaccurate estimates of how often Mr. Craighead called them from work, given in testimony thirteen years after the period in question, have no relation to the significance of the phone record evidence. In fact, it is likely that the witnesses' estimates were accurate, and that Mr. Craighead's other calls simply did

22

not show up on the records because they were placed from other phone lines, or from cellular phones, or made at times when he was not working at Sam's Club. For example, Randle Craighead only stated that Mr. Craighead called him "two to three times a week;" he never claimed that each of those two to three calls per week all occurred while his brother was at work. (Hr'g Tr 45, June 30, 2010.)

But even if Randle Craighead and Isaac Griffin did exaggerate the frequency with which Mr. Craighead called them from work, their testimony in no way negates the incontrovertible documentary evidence that calls were placed to each of them on the day and time in question—the same time Mr. Pruett was killed in Detroit. By concentrating on whether the witnesses may have given inaccurate estimates of how often Mr. Craighead called them, the trial court failed to grasp the indisputable implications of this new evidence—that if Mr. Craighead was at Sam's Club in Farmington Hills working the night of June 26-27, 1997, he could not possibly have killed Mr. Pruett.

To put it simply, given that there is now indisputable evidence that Isaac Griffin and Randle Craighead were called on the night of June 26-27, 1997, and given that both Mr. Griffin and Randle Craighead testified, without the slightest contradiction, that no one else other than Mark Craighead ever called them from Sam's Club in the middle of the night, how often Mr. Craighead called them on other nights is completely irrelevant.

In rejecting the exculpatory value of the newly discovered phone bill, the trial court placed the most weight on the fact that the phone bill shows that several phone calls were also placed from Sam's Club to Randle Craighead and Isaac Griffin during the day shift. (Hr'g Tr 119, July 14, 2010.) The trial court suggested from this fact that perhaps other people at Sam's Club called these two individuals. (*Id.* at 123.) Because Mr.

23

Craighead testified that he regularly worked night shifts, the trial court reasoned that daytime records of calls to Randle Craighead and Isaac Griffin proved that these two people may have had phone relationships with other Sam's Club employees. (*Id.*) That conclusion makes no logical sense for several reasons.

First, while it is true Mr. Craighead did testify that he typically worked night shifts (Hr'g Tr 59-60, June 30, 2010.), neither he nor anyone else testified that he only worked at Sam's Club during night hours. Night shift workers are sometimes called upon to work occasional day shifts, and vice-versa. The night shift was the only shift relevant to the time Chole Pruett was murdered.

Second, the trial court ignored both Randle Craighead's and Isaac Griffin's undisputed testimony that **the only person who ever called them from Sam's Club was Mark Craighead**, (Hr'g Tr 42, 105-106, June 30, 2010), testimony consistent with Mr. Craighead's truthful polygraph responses. (*Id.* at 22-23; June 30, 2010 Polygraph Examination Report, Appendix L, at 2.)

Third, the phone records show that two of the daytime calls that Judge Jones spotted on the phone bill were placed to Isaac Griffin and Randle Craighead in immediate succession—on May 15, 1997, a call was placed from Sam's Club to Mr. Griffin's phone number at 1:37 p.m.; then, at 1:38, one minute later, a call was placed to Randle Craighead from the same Sam's Club line. (Hr'g Tr, 10-11, July 14, 2010; see also Sam's Club Ameritech Telephone Bill, April-May 1997, Appendix K, at page 37, line 16-17; Hr'g Tr 10-11, July 14, 2010.) The fact that these two calls were made in immediate succession from the same phone line strongly indicates that the same person called them back-to-back. And the only person working at the Farmington Hills Sam's

24

Club at that time known to know both Randle Craighead and Isaac Griffin was Mark Craighead.

Especially given the uncontroverted testimony of Isaac Griffin and Randle Craighead that Mark Craighead was the only person who would be calling them from Sam's Club in Farmington Hills, the only rational conclusion from the back-to-back telephone calls to Randle Craighead and Isaac Griffin on May 15, 1997, is that Mark Craighead called his brother and his close friend during a day shift. It is completely irrational to conclude, as the trial court did, that this daytime phone call somehow proves someone else at Sam's Club was calling Isaac Griffin and Randle Craighead and that this unknown person who called during the day on May 15, 1997, was also there during the night shift on June 26-27, 1997.

The trial court's unreasonable disregard of the phone records is further illustrated by its appraisal of the jury note, determining that because "the jury didn't ask for phone records," the new evidence is worthless. (Hr'g Tr 118, July 14, 2010.) At Mr. Craighead's trial, the jury sent out a note during deliberations asking whether there was "a paycheck stub or solid evidence that a forty-hour week was worked." (Trial Tr 170-71, June 24, 2002.) The jury was clearly seeking any kind of documentary evidence that could confirm Mr. Craighead was at work when Mr. Pruett was killed.

Indeed, even the trial court conceded that the jury was looking for "proof that [Mr. Craighead] was at work that day." (Hr'g Tr 118, July 14, 2010.) The phone records constitute exactly this proof. In fact, they are even more conclusive than a paystub, which would only reflect hours worked over a one or two-week period; the phone records link Mr. Craighead to the Sam's Club at the exact time that the crime was occurring.

25

The jury struggled with Mr. Craighead's alibi issue enough to request additional information about it, and the note strongly indicates that, had the jury been presented with such evidence at trial, it likely would have reached a different outcome. The trial court's misunderstanding of the jury's real concern, and the fact that the phone records go directly to that concern, is further indication that the court clearly erred in its ruling.

If a jury had the opportunity to hear this new evidence that directly refuted the prosecution's theory of Mr. Craighead's guilt, it is not only likely but nearly certain that it would not have returned a conviction. The trial court's ruling that the phone records would make no difference if presented at a retrial is both clearly erroneous and an abuse of the court's discretion.

### C.    Mr. Craighead's Newly Discovered Evidence Is Not Cumulative

The new evidence presented to the trial court in Mr. Craighead's evidentiary hearing also is not cumulative. "[E]vidence of a distinct probative fact is not cumulative to evidence of another fact, although both facts support the same issue." *People v Duncan*, 414 Mich 877, 881; 322 NW2d 714 (1982). Evidence is typically deemed cumulative when it affirms evidence of a similar type already presented at trial. See *People v Nixon*, No 266033 (Mich App Mar 1, 2007) (finding that a fourth alibi witness was cumulative to the three alibi witnesses who had already provided similar testimony regarding defendant's whereabouts).

The question of Mr. Craighead's whereabouts on the night Chole Pruett was killed was hotly disputed at his trial. These newly discovered records put this dispute to rest. The phone records directly corroborate Mr. Craighead's assertion that he was at

26

work at the time that Mr. Pruett was killed and the truck was stolen. No other documentary evidence was available to be presented to prove this fact at trial. While trial counsel made an effort to present the most common form of documentary evidence —Mr. Craighead's timecard—that evidence was not available due to a sprinkler accident, which destroyed Mr. Craighead's timecard from that week. (Trial Tr 11, June 24, 2002.) No other evidence presented at trial proves what these phone records prove—that Mr. Craighead was at work, locked in until the next morning, at the time of the crime.

Mr. Craighead's appellate attorney, who had received incorrect phone records from Sam's Club in response to her subpoena, testified at the evidentiary hearing that had she instead received the correct Ameritech phone bill, she would not have considered it to be cumulative. (Hr'g Tr 66-67, July 14, 2010.) Moreover, the prosecution conceded at this hearing that the evidence was not cumulative, noting that "it is qualitatively different than the evidence that was presented at trial, even though it was a defensive alibi, and even though it would supplement the defensive alibi." (*Id.* at 101.)

Perhaps the clearest proof that the evidence is not cumulative is that the jury specifically asked for documentary evidence that Mr. Craighead was at work the night of the killing by sending out a note during deliberations: "Is there a paycheck stub or solid evidence that a forty-hour week was worked?" (Trial Tr 170-71, June 24, 2002.) The jury asked for such documentary evidence because Mr. Craighead was unable to present any at trial. The newly discovered Sam's Club phone records are certainly not cumulative to evidence presented at trial.

27

### D. Mr. Craighead's Newly Discovered Evidence Could Not Have Been Discovered at Trial through Reasonable Diligence

Finally, the existence and importance of the Sam's Club phone records was not and could not have been reasonably known to Mr. Craighead or trial counsel. "Reasonable diligence" in investigation is judged by whether trial counsel was aware of the facts necessary to prompt a more thorough investigation. See, e.g., *People v Deering*, No 274208 (Mich App Dec 11, 2008) (trial counsel was in possession of witness' criminal history and failed to investigate, which does not demonstrate "reasonable diligence" for purposes of newly discovered evidence).

In this case, trial counsel could not reasonably have deduced that a viable alternative to the missing timecard would be phone records from the night in question. Timecards and paystubs are common business records which track employee schedules, but company phone records are not a likely place to find evidence of presence for an employee such as Mr. Craighead, who did not work in an office, especially since such employees are not normally permitted to make personal long-distance phone calls using the company phone. Trial counsel took the most logical steps to establish Mr. Craighead's alibi: he investigated and pursued timecard evidence, and when the timecard proved to have been destroyed by accident, counsel presented testimonial evidence establishing Mr. Craighead's normal work schedule and explaining the missing timecard. (Trial Tr 9-11, June 24, 2002.)

Even if trial counsel could have been expected to know the importance of the Sam's Club phone records, the effort required to finally obtain these records went beyond what would be considered reasonable diligence for a trial attorney. Mr. Craighead's appellate attorney, Valerie Newman, attempted to obtain this evidence when she

28

subpoenaed Sam's Club's phone records. (Hr'g Tr 49-50, July 14, 2010.) She

scrutinized the store's phone log in an attempt to determine whether any of the numbers

reflected on it matched the numbers Mr. Craighead could have called. (*Id.* at 53-54). But

what Ms. Newman did not know was that the Sam's Club records she received captured

only a fraction of the calls made from the Farmington Hills store, and despite Ms.

Newman's best efforts, Mr. Craighead's presence at that Sam's Club could not be

verified from that incomplete call log.

      The complete phone bill was finally obtained when three student attorneys at the

Michigan Innocence Clinic, assigned to Mr. Craighead's case, spent six months in

constant communication with Sam's Club headquarters in Bentonville, Arkansas, and

phone companies AT&T and Ameritech, attempting to obtain the phone records for June

26 and 27, 1997, for the phones located in the Farmington Hills Sam's Club store.

(Antonio Aff., Appendix H (App. L to Motion for Relief from Judgment); Grutman Aff.,

Appendix I (App. M to Motion for Relief from Judgment); Ray Aff., Appendix J (App. N

to Motion for Relief from Judgment).) The process took numerous subpoena requests, as

the prosecution has stipulated (Hr'g Tr 12, June 30, 2010), and countless communications

via phone and fax to coordinate Sam's Club cooperation in providing the phone records.

The students persisted in requesting the documents despite Walmart's assertions that the

phone records were not available. Walmart initially refused to cooperate with the

students as they attempted to obtain the phone records from AT&T (Antonio Aff.,

Appendix H (App. L to Motion for Relief from Judgment)), and AT&T initially failed to

provide complete records when subpoenaed. (*Id.*) Finally, even once the records were

located by AT&T Ameritech, it took an additional month of negotiation to persuade

29

AT&T to provide hard copies of the documents, rather than corrupted, unusable files via email. (Ray Aff., Appendix J (App. N to Motion for Relief from Judgment).) The efforts of the student attorneys at the Michigan Innocence Clinic to chase down the remote possibility that Mr. Craighead might have made personal long-distance phone calls using the company phone on a particular night years ago go beyond what could be considered reasonable efforts by trial counsel in investigating and preparing for an upcoming trial.

At the evidentiary hearing, the prosecution did not dispute this prong of the *Cress* test. The prosecution noted in its closing argument that Ms. Newman "could not [have been] more diligent" in her efforts to obtain the Sam's Club outgoing call records. (Hr'g Tr 110, July 14, 2010.) That Ms. Newman was still unable to locate the calls Mr. Craighead made from Sam's Club perfectly illustrates that reasonably diligent effort could not have uncovered this evidence before trial.

In short, the newly discovered phone records easily meet the four-part test of newly discovered evidence.

30

## CONCLUSION

Therefore, this Court should grant this application for leave to appeal, reverse the trial court's denial of Mr. Craighead's motion for relief from judgment, and order a new trial at which a jury may consider the phone records as proof that Mr. Craighead could not have committed the killing of Chole Pruett.

Dated: December 3, 2010

Respectfully Submitted,

**MICHIGAN INNOCENCE CLINIC**

Bridget McCormack (P58537)
Attorney for Defendant

David A. Moran (P45353)
Attorney for Defendant

Michael Shaffer
Student Attorney for Defendant

Adam Thompson
Student Attorney for Defendant

Katherine O'Connor
Student Attorney for Defendant

31